# Illinois Official Reports

## Appellate Court

---

### *People v. House*, 2015 IL App (1st) 110580

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO HOUSE, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-0580 |
| Filed<br>Rehearing denied | December 24, 2015<br>March 27, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 93-CR-26477; the Hon. Kenneth J. Wadas, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Jessica D. Fortier, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, Annette Collins, and Michele Grimaldi Stein, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justice Reyes concurred in the judgment and opinion.<br>Justice Gordon concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1        Defendant Antonio House appeals the trial court's second stage dismissal of his petition for postconviction relief. Specifically, defendant argues that the trial court erred in dismissing his postconviction petition because (1) he made a substantial showing of actual innocence based on newly discovered evidence of the recantation of a prosecution witness's trial testimony; (2) he made a substantial showing that his constitutional rights were violated based on (a) newly discovered evidence of a pattern of abuse by a police detective, (b) newly discovered evidence corroborating his allegation that police used a rival gang leader to intimidate defendant during an interrogation, and (c) defendant's consistent claim that his confession was coerced; (3) the trial court erred in denying postconviction counsel's request to obtain the Office of Professional Standards (OPS) files on the detectives involved in his interrogation; (4) defendant made a substantial showing that (a) his appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred in denying his motion to quash arrest, and (b) his trial and appellate counsel were ineffective for failing to ensure all OPS files were reviewed; and (5) the statute mandating a sentence of natural life for offenders who kill more than one victim without considering mitigating factors, such as the offender's age and level of culpability, violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 2        For the reasons that follow, we affirm the trial court's dismissal of the postconviction petition and vacate the mandatory sentence of natural life without parole and order a new sentencing hearing.

¶ 3        Following a jury trial, defendant was found guilty of two counts of first degree murder and two counts of aggravated kidnapping in the September 1993 deaths of Stanton Burch and Michael Purham. The trial court subsequently sentenced defendant to two consecutive life sentences for the murder convictions and two terms of 30 years for the aggravating kidnapping convictions to run consecutive to the life sentences.

¶ 4        We review only those facts relevant to the issues raised on appeal. We previously described the general circumstances of this case as follows:

              "The facts of this case arise out of an intra-gang conflict regarding the right to sell drugs on a street corner. In 1993, there was a split in the Unknown Vice Lords (UVL) street gang. The two warring factions were led by Tyrone 'Baby Tye' Williams and Willie Lloyd. Artez 'Ted' Thigpen, a UVL member who remained loyal to Williams, controlled drug sales at the corner of Springfield Avenue and Fillmore Street in Chicago, Illinois. The victims in this case, Stanton Burch and Michael Purnham, were UVL members who were loyal to Lloyd. The day before the victim[s'] deaths, Lloyd and some of his men went to the corner, where they beat up and robbed one of Thigpen's drug sellers. The following day, Burch and Purham were dropped off at the corner, where they announced to Thigpen's drug sellers that the corner now belonged to Lloyd. Burch and Purham then began to sell drugs. Soon thereafter, Thigpen and an armed group of his men arrived at the corner. Defendant allegedly was a member of this group. The group forced Burch and Purham into a car at gun point. Burch and Purham were then taken to a vacant field where they were shot and killed. Defendant was arrested on October 27, 1993, and on the following day gave a handwritten

- 2 -

statement regarding his involvement in the kidnapping and murder of the victims." *People v. House*, No. 1-05-0994, slip op. at 2 (2007) (unpublished order under Supreme Court Rule 23).

¶ 5 Prior to trial, defendant filed a motion to quash arrest and a motion to suppress statements. In his motion to quash arrest, defendant argued that the arrest was made without an arrest warrant and not part of a lawful search. At the hearing on the motion, Detective Luis Munoz testified that he interviewed Eunice Clark, a witness to the homicide, and she mentioned defendant's name as a person involved in the crimes. Sergeant Harvey Rubin testified that in October 1993, he was a tactical police officer and was investigating the homicides of Burch and Purham. Sergeant Rubin was looking for defendant based on information he received as part of the homicide investigation. He received a tip that defendant was on the northwest corner of Springfield and Arthington and wearing a black jacket with white stripes. He requested an additional police unit to go to that location with him and his partner. The other unit arrived first and he heard another officer call out a chase on the police radio, but he did not participate in the chase. He learned that defendant had been arrested. He admitted that he did not have a stop order or an arrest warrant for defendant. Officer Dana Alexander testified that on October 27, 1993, he received information from Sergeant Rubin regarding defendant's location at Springfield and Arthington and what he was wearing. He proceeded to that location and saw a subject fitting the description with other individuals. As he approached and announced his office, defendant ran from the scene. Officer Alexander gave chase and apprehended defendant, placing him under arrest. At the time of his arrest, defendant was in possession of a handgun in his waistband. The trial court denied defendant's motion to quash arrest.

¶ 6 In his motion to suppress statements, defendant asserted that his statement was not voluntary because he never received his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), and the detectives refused to honor his right to remain silent, and subjected him to coercion and intimidation. At the hearing, defendant did not testify, but was sworn to the facts in the motion. Defendant alleged in the motion that he was handcuffed to a wall and left for long periods of time and he was denied food. He stated that the detectives brought rival gang leader Lloyd into his interview room and Lloyd threatened to harm defendant and his family if he did not give a statement. He also said that Detective Perez struck him in the forehead. He gave a statement as a result of this intimidation.

¶ 7 Detectives Ann Chambers and Alfred Perez each testified regarding defendant's interview. Detective Chambers stated that she first met with defendant around 9 a.m. on October 28, 1993. Defendant was in an interview room and was not in handcuffs. She read defendant his *Miranda* rights and offered him a snack. The first interview lasted approximately 30 minutes. Detective Chambers returned around 1 p.m. and gave defendant lunch from McDonald's. Later that afternoon, at around 4:30 p.m., Detective Kriston Kato came on duty for the next shift and her partner Detective Perez went home. She interviewed defendant with Detective Kato at approximately 5:30 p.m. for about an hour. They contacted the felony review unit of the State's Attorney's office around 8:30 p.m. and an assistant State's Attorney (ASA) arrived around 9:30 p.m. Detective Chambers was present when defendant gave a handwritten statement to the ASA. Detective Chambers denied all the allegations in defendant's motion, including that defendant was never placed in handcuffs, that defendant was threatened to give a statement, that defendant requested an attorney, that Detective Perez and Detective Kato were present at

the same time for an interview, that Lloyd was ever brought into the interview room and allowed to threaten defendant, and that Detective Perez struck defendant. Detective Perez testified that he was only present for the interview with defendant at 9:30 a.m. He denied striking defendant in the forehead. The trial court denied defendant's motion to suppress his statements.

¶ 8    Prior to trial, defendant caused a subpoena *duces tecum* to be issued and served on the Chicago police department for the OPS records on Detectives Kriston Kato, Alfred Perez, Ann Chambers, and Officer Michael Cronin. In February 1998, the trial court granted the City of Chicago's motion to quash the subpoena.

¶ 9    At trial, the State presented the testimony of Eunice Clark and her boyfriend Barry "Smurf" Williams (Barry). Clark admitted that at the time of trial, she was serving an 11-year sentence for two attempted murder convictions. Clark testified that in September 1993, she was 16 years old and a member of the Traveling Vice Lords gang. At around 10 a.m. on September 12, 1993, Clark was at the corner of South Springfield Avenue and West Fillmore Street in Chicago. She was at that location to sell drugs for Thigpen and Williams with several other drug dealers, including "Smurf." That day, Clark saw Lloyd and his bodyguards call over one of the drug dealers, "Larry." Lloyd and his bodyguards beat up Larry and took Larry's drugs and money.

¶ 10   The next day, on September 13, 1993, Clark was on the same corner with other dealers waiting to sell drugs. Lloyd then drove up and dropped off Burch and Purham. Burch and Purham began selling drugs. Later, Thigpen and Williams drove by the corner. They returned a short time later with two additional men in the car. Clark testified that several other men ran over from nearby railroad tracks. She stated that all of the men were armed with a handgun. Clark identified defendant as one of those men. Thigpen and the men surrounded Burch and Purham and forced them into Thigpen's vehicle at gunpoint. Clark heard a loud noise inside the car, but was not positive if it was a gunshot.

¶ 11   Clark testified that Thigpen told her that if anyone asked where Burch and Purham were, that she was to say that the police picked them up. Thigpen got into his car and drove off. The rest of the men returned to the area near the railroad tracks on foot. Later that day, Clark told Burch's girlfriend what happened. That evening, Clark was approached by Burch's mother and the police. Clark was taken to the Area 4 police station and spoke with detectives. She returned and gave a signed statement on September 16, 1993.

¶ 12   Clark also testified that on October 12, 1993, she was walking near 18th Street and St. Louis Avenue when she saw defendant and another individual in a gray vehicle. They pulled the car over and asked Clark to get into the car. Clark refused, and the men tried to force her into the car with one man striking her in the back of the neck. When the men let go, defendant told her that he did not want her to testify. Clark said she told them that she had to testify.

¶ 13   Clark admitted that she received a total of $1,200 in relocation expenses from the State, but she used the majority of the money on clothes and personal items.

¶ 14   Barry testified at trial that he also went by the name Aaron Lamar. At the time of trial, he was serving a six year sentence for a narcotics conviction. In September 1993, he was 23 years old and was in a relationship with Clark. Barry was a member of the UVL gang. Barry was unable to recall most of his prior statements and testimony, but his handwritten statement and grand jury testimony were introduced at trial. His prior statements corroborate Clark's testimony regarding the events of September 13, 1993, including defendant's involvement.

¶ 15 Barry stated that on the morning of September 13, 1993, he was waiting for Thigpen to bring drugs for him to sell on the corner of Springfield and Fillmore with Clark and two other individuals. Another car approached the intersection and two men got out of the vehicle. He did not recognize these individuals. According to Barry, the men said that location was no longer Thigpen's, and now belonged to Lloyd. The two men then proceeded to sell drugs at that location. Thigpen drove by the location and then returned approximately 10 minutes later with two men in the car. Several other men approached the intersection at that time, including defendant. The men were armed with handguns. They surrounded the two men selling drugs and forced them into Thigpen's car. Thigpen drove away and the other men returned the way they came.

¶ 16 ASA Solita Pandit testified at trial that she took defendant's handwritten statement on October 28, 1993, and published the statement to the jury. Defendant stated that he was a member of the UVL gang. He worked for Thigpen to sell drugs at the corner of Springfield and Fillmore. Defendant said that Lloyd used to be the "head boss" of the UVL, but there was fighting regarding that position. He had heard that one of Thigpen's workers had been robbed by Lloyd and his men on September 12, 1993. On September 13, 1993, defendant was on Springfield between Arthington and Fillmore when he saw Clark. Clark told defendant that Lloyd had dropped off two of his workers at the spot and the police had picked them up. Clark then said that Thigpen told her to say this, but that Thigpen "had got them, put them into his car and drove them away." Defendant then saw Weatherspoon and another UVL. Weatherspoon told defendant to get his car and pick them up because they needed to go meet Thigpen at the railroad tracks at California and Roosevelt. Weatherspoon told defendant that Thigpen had two of Lloyd's men and they were going to be "violated," meaning "physically punished, ranging from being hit with hands, boards or being shot." Defendant drove them to where Thigpen was with Lloyd's men.

¶ 17 At that location, defendant saw another UVL member, Derrick Harvey. He said two cars were parked with the hoods up to appear as though a car battery needed to be jumped. Harvey said he was acting as a lookout for the police for Thigpen who was violating Lloyd's men by the railroad tracks. Defendant parked his car and also acted as a lookout. He heard approximately eight gunshots from the railroad tracks and then saw several UVL members. He was told by Williams that "they got Willie's boys," which defendant knew meant the men had been killed.

¶ 18 Defendant stated that he had a gun when he was arrested, but it was not the gun used in the shootings. He also said he received a phone call from Williams in jail on October 11, 1993. Williams told defendant to tell Clark not to come to court to testify against him. The next day, defendant saw Clark and told her not to testify.

¶ 19 Defendant stated that he was treated well by the police and he was not made any promises for his statement nor was he threatened in any way.

¶ 20 Defendant testified at trial on his own behalf. He stated that he was a member of the UVL and he was 19 years old on September 13, 1993. On that date, he drove to the vicinity of Springfield and Fillmore to sell drugs for Thigpen. He saw Clark, Barry, and other people in the area. Defendant said he asked Clark where everyone was, meaning the people who issued the drugs to the sellers. Clark initially told him that the police came and everyone was gone. Shortly thereafter, Clark said that Thigpen, Weatherspoon, and others took someone to be violated. Defendant then walked to the corner and saw Weatherspoon and another person.

They told defendant that two men had been violated and needed a ride. Defendant drove the two men west on Roosevelt until Weatherspoon told him to pull over near Campbell. Two cars were parked under the railroad tracks viaduct with their hoods up. He recognized other UVL members, including Harvey. He dropped off Weatherspoon and the other man, then he made a U-turn and left that location. As he was leaving, he heard approximately eight gunshots and saw several people coming from the railroad tracks.

¶ 21 Defendant testified that after he was arrested, he remained in lockup for 10 to 12 hours. He was taken to an interview room by Detectives Chambers and Perez, where he was handcuffed to a wall. Detectives Chambers and Perez left him there for a period of time and when they returned, they told defendant they knew he had nothing to do with the shooting, but needed him to make a statement. He stated that he told them to leave him alone and he had no knowledge of the shooting.

¶ 22 Defendant testified that he was next interviewed by Detective Kato. According to defendant, Detective Kato said, "I know that you didn't shoot those boys, but I know that you have some type of knowledge about it. And that if you don't make a statement about Baby Tye and Ted, then you'll go down for this." Defendant stated he did not give a statement at that time. Defendant testified that he feared for his life and his family. Detective Kato left the room. Later, Detective Kato returned with Detectives Chambers and Perez, Officer Cronin, and Lloyd. Defendant stated that Detective Kato told him that they have Lloyd in the room and to tell them the truth or he would be hurt. Defendant testified that Lloyd then threatened to hurt him and his family. Everyone except Detective Kato left the room. Defendant said that Detective Kato told him that now they have Lloyd on their side and defendant was going to cooperate. Defendant said he agreed to give a statement shortly thereafter. Defendant further stated that Detective Kato promised to protect defendant and his family if he gave a statement.

¶ 23 Defendant then testified he was brought into a room where ASA Pandit was already sitting. He stated that ASA Pandit did not write the statement in his presence, but he admitted that he signed it. He denied reading the statement before signing it. Defendant said that he believed that he would be a witness for the State against Thigpen and Williams. He denied that he acted as a lookout near the railroad tracks or that he was present when the men were forced into Thigpen's car. He denied that he was treated well by the police and that Detective Chambers brought him food.

¶ 24 Following deliberations, the jury found defendant guilty of two counts of first degree murder and two counts of aggravated kidnapping. The trial court subsequently sentenced defendant to two consecutive life sentences for the murder convictions and received two consecutive 60-year sentences for the aggravated kidnapping convictions.[1]

¶ 25 On direct appeal, defendant argued that (1) the trial court abused its discretion in quashing defendant's subpoena seeking access to the OPS files for Detectives Kato, Chambers and Perez, and Officer Cronin; (2) the State failed to rebut defendant's assertion that Detective Kato threatened defendant's safety and his family if defendant did not give a statement against Thigpen and Williams; (3) the trial court abused its discretion in allowing the State to present evidence that two codefendants were seen at a gang funeral, ran from police, and possessed

---

[1]Defendant originally received consecutive 60-year sentences for the aggravated kidnapping convictions, which was reduced to consecutive 30-year terms on remand.

guns when they were arrested; and (4) defendant's consecutive and extended-term sentences violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

¶ 26    On December 21, 2001, another panel of this court affirmed defendant's convictions, vacated his aggravated kidnapping sentences, and remanded the matter for resentencing. *People v. House*, No. 1-98-4324 (2001) (unpublished order under Supreme Court Rule 23). The reviewing court found that defendant had waived his claim regarding the subpoena for OPS complaints because he did not include the subpoena in the record on appeal. *Id.* at 17. The reviewing court subsequently vacated that order and, on May 10, 2002, issued a modified order upon denial of rehearing. *People v. House*, No. 1-98-4324 (2002) (unpublished order under Supreme Court Rule 23). In that order, the court again found that defendant had waived his claim regarding the subpoena for OPS complaints. *Id*. at 17.

¶ 27    On May 30, 2002, the Supreme Court of Illinois issued a supervisory order wherein it directed this court to vacate the judgment of December 21, 2001, to reconsider that decision in light of new authority, and to consider defendant's appeal from the trial court's order granting the motion to quash his subpoena to the OPS. *People v. House*, No. 93470 (Ill. May 30, 2002). On August 16, 2002, another panel of this court found that the trial court abused its discretion by failing to conduct an *in camera* inspection of the OPS files requested by defendant and, accordingly, the court reversed defendant's convictions and remanded the matter for a new trial. *People v. House*, No. 1-98-4324 (2002) (unpublished order under Supreme Court Rule 23).

¶ 28    On December 5, 2002, the supreme court issued a supervisory order directing this court to vacate the order dated August 16, 2002, and remanding the case to the circuit court "for an *in camera* inspection of the records of the Office of Professional Standards requested by defendant." *People v. House*, No. 94670 (Ill Dec. 5, 2002). The supervisory order directed the circuit court "to determine what, if any, material should be disclosed to defendant," and further stated that, "[i]n the event new evidence is disclosed, defendant shall be allowed to file a motion for [a] new trial if indicated." *Id.*

¶ 29    In February 2005, the trial court issued its ruling on the OPS files. The court observed that it received 50 files, 32 of the files related to Detective Kato, but 18 did not. Of the 32 files related to Detective Kato, the trial court noted that, under the appropriate standard of review, prior allegations of abuse are admissible when they are not unduly remote in time from the occurrence before the court, when they involve the same officer and similar allegations of misconduct, and when, in both the prior allegations and the case before the court, there is some evidence of injury consistent with the police brutality allegations, though this criteria was not relevant to the current inquiry. The court found 22 complaints to be too remote in time from the interrogation in 1993. However, the court still reviewed these complaints under the second criteria and determined that none involved similar factual allegations. The trial court reviewed the remaining 10 complaints and concluded that none raised similar factual allegations. The court then held that since none of the OPS files contained similar factual allegations, there was no basis to release them to defendant. The trial court also imposed 30-year terms for the aggravated kidnapping convictions, consecutive to the sentences for natural life.

¶ 30    On appeal, defendant argued that the trial court abused its discretion in denying him access to the OPS files pertaining to Detective Kato. This court found that "the OPS files produced in response to defendant's subpoena are not relevant to his claim that Detective Kato coerced him into signing a false confession" and the trial court did not abuse its discretion. *House*, No.

1-05-0994, slip op. at 14. We did find that one OPS file contained "an allegation that could be characterized as somewhat similar to the allegation made by defendant," but concluded that one OPS file did not show a pattern and practice by Detective Kato and held that it was not relevant to defendant's claim. *Id.* at 13-14.

¶ 31    While his direct appeal was pending, defendant filed a *pro se* petition for postconviction relief in September 2001, alleging that (1) he was denied a fair trial through the knowing use of perjured testimony and fabricated evidence by the police officers and assistant State's Attorneys, (2) Clark's initial testimony before the grand jury only named Thigpen and Weatherspoon as involved in the kidnapping of Burch and Purham, and (3) Clark has recanted her trial testimony identifying defendant as participating in the kidnapping. In December 2001, the trial court dismissed defendant's postconviction petition, finding that it lacked jurisdiction while defendant's direct appeal remained pending.

¶ 32    Defendant appealed the dismissal. In January 2003, the State filed a confession of error in the appeal. The State "concluded that error was committed in the circuit court because the Post-Conviction Hearing Act does not bar a circuit court from considering a post-conviction petition while a direct appeal of the defendant's criminal conviction is pending." The State asked that the case be reversed and remanded to the trial court with directions to proceed to the second stage of the postconviction process. The reviewing court allowed the State's confession of error in February 2003, vacated the dismissal, and remanded the case for second stage review under the postconviction process.

¶ 33    Upon remand, defendant's postconviction petition was assigned to an assistant public defender for further review. In October 2009, defendant filed a motion for discovery of the OPS file on Detective Kato as well as files on Detectives Chambers and Perez and Officer Cronin. In November 2009, defendant filed a supplemental motion for discovery and requested access to the internal affairs department reports for the officers, which had not previously been requested. In January 2010, the trial court denied defendant's motion, finding the requests "speculative in nature" and that it was "not really anything more than a fishing expedition to try to find out if they can develop good cause."

¶ 34    In April 2010, defendant filed his amended postconviction petition. The amended petition raised 15 issues in 43 pages, with approximately 300 pages of exhibits. The petition raised numerous claims of ineffective assistance of trial and appellate counsel, claims of a denial of due process, newly discovered evidence of actual innocence based on Clark's affidavit, newly discovered evidence of police misconduct by Detective Kato, and the imposition of a mandatory life sentence as applied in defendant's case was unconstitutional. The State filed a motion to dismiss defendant's amended postconviction petition, arguing that everything raised in the petition was either raised on direct appeal or could have been raised on direct appeal. The State asserted that defendant attempted to bypass waiver and *res judicata* by alleging ineffective assistance of appellate counsel or newly discovered evidence, but defendant cannot establish ineffectiveness under *Strickland v. Washington*, 466 U.S. 668 (1984), nor does the alleged newly discovered evidence satisfy the requirements of *People v. Washington*, 171 Ill. 2d 475 (1996). In February 2011, the trial court granted the State's motion and dismissed defendant's amended postconviction petition.

¶ 35    This appeal followed.

¶ 36    The Illinois Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 to 122-8 (West 2008)) provides a tool by which those under criminal sentence in this state can

assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2008); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-47 (2005).

¶ 37        At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2008). If the circuit court does not dismiss the postconviction petition as frivolous or patently without merit, then the petition advances to the second stage. Counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2008)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2008)). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. See *Coleman*, 183 Ill. 2d at 381. If no such showing is made, the petition is dismissed. "At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, and, in the event the circuit court dismisses the petition at that stage, we generally review the circuit court's decision using a *de novo* standard." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If, however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2008).

¶ 38        Defendant first argues that he made a substantial showing of actual innocence based on newly discovered evidence. Specifically, he contends that Clark's affidavit recanting her trial testimony showed that he did not participate in the crimes at issue.

¶ 39        As an exhibit to his petition, defendant included an affidavit, dated June 12, 2001, from Clark. Clark stated that she was a witness to the kidnapping of Burch and Purham on September 13, 1993, and that she "never saw Antonio House kidnap or conspire to kidnap Stan Burch and Michael Purham nor did [she] see Antonio House with a weapon." Clark also said that "On October 12th 1993, I was never confronted by Antonio House neither has Mr. House threaten me [*sic*] or cause me bodily harm. To my personal knowledge Antonio House name was only mention [*sic*] because he was a worker for Ted."

¶ 40        In *People v. Washington*, 171 Ill. 2d 475, 489 (1996), the supreme court held that a postconviction petitioner may pursue a claim of actual innocence based on newly discovered evidence. To succeed under that theory, the supporting evidence must be new, material, and noncumulative, and it must be of such conclusive character that it would probably change the result on retrial. *Id*. Newly discovered evidence must be evidence that was not available at defendant's trial and that the defendant could not have discovered sooner through diligence. *Barrow*, 195 Ill. 2d at 541. "Generally, evidence is not 'newly discovered' when it presents facts already known to the defendant at or prior to trial, though the source of those facts may

have been unknown, unavailable, or uncooperative." *People v. Barnslater*, 373 Ill. App. 3d 512, 523-24 (2007).

> "Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" *People v. Coleman*, 2013 IL 113307, ¶ 96.

¶ 41    As the Illinois Supreme Court observed, "[w]e deem it appropriate to note here that the United States Supreme Court has emphasized that such claims must be supported 'with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial.' " *People v. Edwards*, 2012 IL 111711, ¶ 32 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). " 'Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.' " *Id.* (quoting *Schlup*, 513 U.S. at 324). A claim of actual innocence is not a challenge to whether the defendant was proved guilty beyond a reasonable doubt, but rather an assertion of total vindication or exoneration. *Barnslater*, 373 Ill. App. 3d at 520.

¶ 42    Here, defendant has failed to provide "reliable evidence." Clark's affidavit is neither exculpatory scientific evidence, a trustworthy eyewitness account, nor critical physical evidence. Rather, Clark's affidavit contains conclusory statements that fail to exonerate defendant. We point out that "the recantation of testimony is regarded as inherently unreliable, and a court will not grant a new trial on that basis except in extraordinary circumstances." *People v. Steidl*, 177 Ill. 2d 239, 260 (1997). Clark offered no explanation regarding why she changed her statement eight years after the crimes were committed. She simply stated without any explanation that she did not see defendant kidnap or conspire to kidnap the victims. We also point out that Clark's trial testimony never indicated that she was present for any planning or conspiracy to commit the crimes, and her statement in the affidavit on this point fails to offer any proof of actual innocence. Further, the affidavit offers no facts to support her change in testimony.

¶ 43    Additionally, we observe that portions of Clark's trial testimony were corroborated by other facts in the case. "At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true ***." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The record rebuts Clark's statements in the affidavit and supports her trial testimony. Clark admitted telling Burch's girlfriend what happened on the day it occurred, and later she voluntarily spoke with the police, which significantly helped the police investigation of several individuals. She named several participants other than defendant, including Derrick Harvey, who later led the police to where the bodies were found. Clark's testimony was also consistent with the ongoing rivalry between factions of the UVL.

¶ 44    Moreover, even if we presume that Clark's affidavit constitutes new, material, and noncumulative evidence, defendant has not set forth a substantial showing that this evidence is of such a conclusive character that it would probably lead to a different result.

¶ 45    Defendant asserts that without Clark's identification of defendant "there is very little evidence on which a trier of fact could base a conviction," noting his allegations of coercion in regard to his statement as well as characterizing Barry's testimony as "unreliable and impeached testimony and repudiated statements." We disagree with defendant's characterization of Barry's trial testimony. While Barry did not recall much of his prior statement or grand jury testimony at trial, both were published to the jury through the testimony of the respective assistant State's Attorneys. Barry's prior statement and grand jury testimony placed defendant at the scene of the kidnapping.

¶ 46    Further, Clark's affidavit does not exonerate defendant for his participation in the murders. Her affidavit does not state that defendant was not present as a lookout near the scene of the murders. Even if we assume Clark's statements in the affidavit are true, the affidavit does not mean that defendant did not participate in the crimes. We also note that Clark's prior testimony would be admissible as substantive evidence on retrial. See 725 ILCS 5/115-10.1 (West 2014). Newly discovered evidence which merely impeaches a witness will typically not be of such conclusive character as to justify postconviction relief. *Barnslater*, 373 Ill. App. 3d at 523. Clark's affidavit fails to exonerate defendant, and is not so conclusive such that it would probably change the result on retrial. Accordingly, we find that the trial court properly dismissed this claim of actual innocence.

¶ 47    Defendant next contends that he has made a substantial showing that his constitutional rights were violated because he has submitted newly discovered evidence of a pattern of abuse and misconduct by Detective Kato as well as newly discovered evidence to corroborate defendant's allegation that police used Lloyd to intimidate defendant during an interrogation. In the alternative, defendant asserts that if this court finds that the evidence is not newly discovered, then he has set forth a substantial showing of ineffective assistance of trial counsel. The State maintains that this claim is barred under the doctrine of *res judicata*.

¶ 48    As previously observed, *res judicata* bars consideration of issues that were raised and decided on direct appeal. *Blair*, 215 Ill. 2d at 443. The supreme court has "recognized, however, that, in the interests of fundamental fairness, the doctrine of *res judicata* can be relaxed if the defendant presents substantial new evidence." *People v. Patterson*, 192 Ill. 2d 93, 139 (2000). "The standards addressing when new evidence is sufficiently substantial so as to relax *res judicata* are the same standards used to determine whether newly discovered evidence should result in a new trial." *Barnslater*, 373 Ill. App. 3d at 530.

¶ 49    Defendant's first piece of newly discovered evidence is an affidavit from Casey Dunbar. Dunbar averred that he was arrested on October 27, 1993. He was placed in a lineup with defendant and others that evening at Area 4 which was viewed by Lloyd, the complaining witness in Dunbar's case. According to defendant, this affidavit established that Lloyd was at the police station at the time of defendant's interrogation and lends support to his allegation that the police allowed Lloyd to threaten defendant. Defendant also included his own affidavit stating that he was arrested on October 27, 1993, and placed in a lineup with Dunbar, but at the time he did not know what case the lineup was for. He stated that this occurred prior to Lloyd being brought into defendant's interrogation. Defendant asserts that he has made a substantial showing that if the trial court heard this independent evidence corroborating Lloyd's presence at Area 4, then the outcome would have been different.

¶ 50    As we have previously stated, evidence is not newly discovered when it presents facts already known to the defendant at or prior to trial, though the source of those facts may have

been unknown, unavailable, or uncooperative. *Id.* at 523-24. Here, defendant knew he appeared in a lineup with Dunbar from the date of his arrest. Defendant could have discovered this evidence earlier through due diligence. Defendant offers no explanation as to why he could not have discovered this evidence earlier. Because defendant knew of these facts prior to trial, the affidavit cannot constitute newly discovered evidence for defendant's postconviction petition.

¶ 51 However, even if we accepted this evidence as new, which we do not, Dunbar's affidavit is not of such a conclusive nature that the result of the proceeding would likely be different. Dunbar's affidavit places Lloyd at the police station the day defendant was arrested. Transcripts attached to defendant's postconviction petition show that postconviction counsel requested to see lineup reports in Dunbar's case, but the trial court, after reviewing the reports, denied the request. The court noted that Lloyd was surrendered to view the lineup by his private attorney, who was present at the police station as well. The court found it implausible that Lloyd would have been involved with the detectives in defendant's case while Lloyd's attorney was present.

¶ 52 Further, we point out that defendant's allegations in his motion to suppress do not indicate that he was removed from the interrogation room to participate in a lineup on another case. Rather, defendant stated that he was left alone in the room between questioning. Given the contradictory evidence in the record, defendant cannot show how Dunbar's affidavit advances his claim that his confession was involuntary. Accordingly, defendant's claim of newly discovered evidence is without merit.

¶ 53 Defendant also contends that he has presented newly discovered evidence in the form of cases, articles, and affidavits of other criminal cases in which allegations of coercion and physical abuse were made against Detective Kato. In his brief, defendant specifically highlights two cases, *People v. McDaniel*, 326 Ill. App. 3d 771 (2001), and *People v. Wallace*, 299 Ill. App. 3d 9 (1998).

¶ 54 Even if we presume that defendant could not have found this evidence earlier through due diligence, these allegations are not material to his allegations of police misconduct. While there were allegations against Detective Kato in these two cases, neither case involved a defendant's statement being suppressed because of police coercion or misconduct. In *McDaniel*, the reviewing court found the defendant's confession to be involuntary because he was 14 years old, the police frustrated his mother's attempts to confer with the defendant prior to interrogation, the youth officer showed no interest in protecting the defendant's welfare; and the timing and circumstances, the defendant being woken up and taken from his mother's home at 2 a.m., contributed to the coercive nature of the interrogation. *McDaniel*, 326 Ill. App. 3d at 787. While the defendant did testify at his suppression hearing regarding comments by Detective Kato stating that the defendant would go to jail if he did not give a statement, these statements were not the basis of the suppression of the defendant's confession. Nor did the court express any opinion as to whether these statements were improper. *Id.* at 777-78.

¶ 55 Although defendant cites to a sworn declaration by Andre Wallace filed in his federal case against Detective Kato, another detective, and the City of Chicago attached to his postconviction petition, we observe that Wallace's conviction was reversed because the court on appeal found that the police lacked probable cause to arrest defendant. *Wallace*, 299 Ill. App. 3d at 21. The reviewing court remanded for an attenuation hearing to determine if Wallace's confession was sufficiently attenuated from his illegal arrest. *Id.* On remand, the

trial court found that the confession was sufficiently attenuated, but the reviewing court disagreed and suppressed the confession on appeal. Wallace's case was later nol-prossed by the State. *Wallace v. City of Chicago*, 440 F.3d 421, 423-24 (7th Cir. 2006). Wallace later filed the federal case under 42 U.S.C. § 1983 asserting that Detective Kato and another detective as well as the City of Chicago had violated his fourth amendment rights and that they had also committed the state torts of malicious prosecution and false imprisonment. The district court granted summary judgment in favor of the defendants because the suit was time barred, which the Seventh Circuit affirmed. *Wallace*, 440 F.3d at 423. The Supreme Court also found that Wallace's suit was untimely and affirmed the dismissal. *Wallace v. Kato*, 549 U.S. 384 (2007).

¶ 56 Further, even if we consider Wallace's statements in his sworn declaration, the bulk of the statements regarding Detective Kato involve allegations of physical abuse. The only allegation of physical abuse by defendant was made against Detective Perez. Defendant alleged that Detective Perez struck him in the forehead, but the detective testified at the suppression hearing that he never struck defendant. As this court has already determined, "the essence of defendant's claim is that he was coerced into signing a confession when Detective Kato brought a rival gang member into the interview room and allowed him to threaten defendant and his family." *House*, No. 1-05-0994, slip op. at 12. Neither of these cases involved any similar conduct by Detective Kato.

¶ 57 Defendant also refers to the unnamed 1993 case that this court discussed in his prior appeal as being similar to defendant's case as support and also asks this court to disclose that case. However, the OPS files previously reviewed by this court were not included in the record on appeal and, therefore, this court will not consider any claims related to the substance of the OPS files. Defendant, as appellant, bears the burden of providing a sufficiently complete record to support a claim of error. In the absence of a complete record on appeal, we will presume that the order entered by the circuit court was in conformity with law and had a sufficient factual basis and any doubts arising from the incompleteness of the record will be resolved against the appellant. *People v. Fair*, 193 Ill. 2d 256, 264 (2000) (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)).

¶ 58 Defendant also attached 140 pages of exhibits consisting of motions, portions of trial transcripts, portions of briefs, unpublished orders, copies of opinions, and a list of additional sources to his postconviction petition to support his claim of newly discovered evidence of similar claims of police misconduct directed at Detective Kato. Defendant contends that these six cases, including *McDaniel* and *Wallace*, show that Detective Kato had a pattern of offering false promises of leniency to overbear a defendant's or witness's will. After our review of these exhibits, we observe that all of these cases involved claims of physical abuse by Detective Kato, consisting of hitting, punching, kicking, and slapping the defendants. Three of these four cases cited by defendant were affirmed on direct appeal and the defendants did not raise a claim of error based on any police misconduct. See *People v. Murray*, 254 Ill. App. 3d 538 (1993), *People v. Prince*, 288 Ill. App. 3d 265 (1997), and *People v. Lucas*, No. 1-92-0372 (1994) (unpublished order under Supreme Court Rule 23). In the fourth case, the defendant was acquitted in the state court, but subsequently filed a federal lawsuit against Detective Kato. Defendant has included portions of the trial transcript, but it is unclear whether a motion to suppress was granted in the criminal case and if so, whether it was based on Detective Kato's alleged misconduct, including instances of physical abuse. See also *Waslewski v. Kato*, No. 96 C 6940, 1993 WL 8761 (N.D. Ill. Jan. 14, 1993).

¶ 59    Defendant has failed to show how the presentation of these cases in the trial court would probably lead to a different result. While the cases included brief statements attributed to Detective Kato that the defendants would receive a lesser charge or would be released if they gave a statement, the crux of the allegations against Detective Kato in these cases involved physical abuse, which defendant has not alleged. Any references to promises of leniency were *de minimis* in light of the detailed allegations of physical abuse. Defendant has failed to present substantial evidence to warrant the relaxation of the doctrine of *res judicata*. Accordingly, the trial court properly found that defendant's claim of newly discovered evidence regarding his allegations against Detective Kato are barred by *res judicata*.

¶ 60    In the alternative, defendant claims that his trial counsel was ineffective for failing to investigate and present this evidence in support of his claim that his statement was coerced. Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id.* at 697.

¶ 61    Since we have already found that the allegations in this newly discovered evidence involved claims of physical abuse, which was not alleged by defendant, and defendant failed to show a reasonable probability that the result would have been different, defendant cannot make a substantial showing that he was prejudiced by any alleged error. Therefore, the trial court properly dismissed defendant's claim of ineffective assistance of trial counsel.

¶ 62    Defendant next argues that the trial court erred in denying his request to reopen discovery when his postconviction counsel requested to obtain the OPS reports previously reviewed by the trial court. Specifically, defendant asks (1) this court to remand to the trial court to allow counsel to review all 50 OPS files, (2) this court to review the 18 OPS files that did not involve Detective Kato or remand to the trial court for review, and (3) this court to reveal the case we previously found similar to defendant's case in a prior appeal. Additionally, defendant asserts that his trial and appellate counsel were ineffective for failing to ensure that all of the OPS files were reviewed by the trial court for complaints against all four detectives.

¶ 63    However, as we previously observed, the OPS files at issue were not included in the record on appeal and, therefore, this court is unable to consider any claims related to the substance of the OPS files. As pointed out above, it is defendant's burden to provide a sufficiently complete record to support his claim of error, and any doubts arising from the incompleteness of the record will be resolved against the appellant. *Fair*, 193 Ill. 2d at 264 (citing *Foutch*, 99 Ill. 2d at 391-92). Therefore, without the OPS files, we cannot consider defendant's requests for this

court to review these files or to release the name of the previously reviewed file which are not part of the record on appeal.

¶ 64 "The discovery rules for neither civil nor criminal cases apply to proceedings under the Post-Conviction Hearing Act." *Id.* "Nonetheless, the circuit court has inherent discretionary authority to order discovery in post-conviction proceedings." *Id.* "Circuit courts, however, must exercise this authority with caution because post-conviction proceedings afford only limited review of constitutional claims not presented at trial, and there is a potential for abuse of the discovery process in post-conviction proceedings." *Id.* Accordingly, a trial court will only allow a discovery request on postconviction when the moving party has shown good cause. *Id.* at 264-65. We review the trial court's denial of a discovery request in postconviction proceedings for an abuse of discretion. *Id.* at 265.

¶ 65 The request to review OPS files has been raised multiple times before the trial court and on appeal. Any request to review Detective Kato's OPS files has been completely litigated in the trial court and by this court. We have already reviewed the OPS files and concluded that the cases were not relevant and a pattern and practice was not established. See *House*, No. 1-05-0994. We find any consideration of OPS files related to Detective Kato to be *res judicata* and decline to review the issue again.

¶ 66 We next turn to defendant's request for discovery related to Detectives Chambers and Perez and Officer Cronin. On direct appeal, the supreme court entered a supervisory order directing the appellate court to vacate its Rule 23 order, filed August 16, 2002, and remanding the case to the trial court for an "in camera inspection of the records of the [OPS] requested by defendant." *People v. House*, No. 94670 (Ill. Dec. 5, 2002) (supervisory order). On January 29, 2003, defendant's trial counsel appeared before the trial court on remand and stated that he "issued a subpoena for those records" and that time was needed to compile the requested documents. However, this subpoena is not contained in the record. Without the subpoena filed on remand, we do not know if defendant specifically requested a review of OPS files for only Detective Kato or for all four officers. The record following remand indicates that the request was only for OPS files related to Detective Kato. At no point before the trial court nor on appeal was an objection raised that the subpoena filed on remand was not properly followed in that it required a review of Detectives Chambers and Perez and Officer Cronin in addition to Detective Kato. Neither the trial court nor the parties referenced any other police officer other than Detective Kato at any time until postconviction counsel filed her discovery motion.

¶ 67 When the trial court entered its findings on the OPS files in February 2005, the court summarized defendant's request as follows.

"The case is here for me to review 50 OPS complaints, complaints register numbers purportedly relating to Detective Kato and make an analysis to see if any of those are somehow relevant to the case at hand, which would trigger the release of those documents to the defense and possibly new discovery and things like that, a new hearing potentially on the issue of his voluntariness of his statement.

Is that about what both sides believe we're here for?"

¶ 68 In response, defense counsel stated, "That's my understanding," and the prosecutor answered, "Yes, Judge." The trial court then proceeded with its findings. The court noted that it "thought that the 50 complaint files related to Detective Kato. But in reality, a number of the files did not relate to Detective Kato at all." The court found that "18 files within the box of 50 wherein Detective Kato was not named in any of the complaints, leaving 32 complaints to

- 15 -

review." The court then outlined the basis for its conclusions that none of the 32 complaints merited disclosure to defendant.

¶ 69 Further, in July 2006, defense counsel filed a motion to amend the record on appeal, requesting the trial court to seal the OPS complaints "pertaining to Chicago Police Detective Christian Kato and append them to the Common Law Record in appellant's appeal No. 05-0994." On appeal, defendant specifically argued that the trial court abused its discretion in ruling that, based on its review of the OPS files against Detective Kato, none of the files were relevant to defendant's claim of coercion by Detective Kato.

¶ 70 During postconviction proceedings, postconviction counsel filed a motion for discovery seeking the OPS records for Detective Kato, as well as Detectives Chambers and Perez and Officer Cronin. At the hearing on this motion, postconviction counsel stated that after the remand in 2003, the prior counsel "filed another subpoena that was the same for all the four officers." Counsel stated she had copies of the subpoena, but a copy was not attached to her discovery motion nor does it appear in the record on appeal. Defense counsel stated that defendant's request "started out with a subpoena with everyone acknowledging it was going to be for the four officers, and somehow it ended with only an *in camera* review of one of the officers."

¶ 71 The trial court then responded, "That's what I was ordered to do by the Appellate Court. Review all the OPS records from Detective Cato [*sic*]. That's what I did. And that issue went up on appeal and was affirmed." Later, the trial court stated, "I was never told to go beyond Cato [*sic*]. I was told to review, read every single one of Cato's [*sic*] OPS complaints. And look for a pattern. That's what I was basically instructed to do by the Appellate Court, not other detectives." Following arguments, the trial court denied defendant's motion, finding the request for OPS records to be "speculative in nature. Is not really anything more than a fishing expedition to try to find out if they can develop good cause." "At this point, they have not established a requisite good cause for the records." We note that despite filing a discovery motion requesting these files, no claim was raised in defendant's amended postconviction petition regarding misconduct by Detectives Chambers and Perez and Officer Cronin or the denial of the motion.

¶ 72 Without the subpoena filed after remand, we have no way to determine what precisely was requested by defendant for the trial court's *in camera* review. As we have stated, it was defendant's burden to provide a sufficiently complete record to support his claim of error, and we will presume that the order entered by the circuit court was in conformity with law and any doubts arising from the incompleteness of the record will be resolved against the appellant. *Fair*, 193 Ill. 2d at 264 (citing *Foutch*, 99 Ill. 2d at 391-92). Based on the record after the remand, the parties and the trial court appeared to proceed with a request limited to Detective Kato, which was the substance of the prior appeal. It would be speculation to presume that the request was broader than both the parties and the trial court agreed. Rather, we presume that the trial court properly reviewed the OPS files as requested for Detective Kato. Accordingly, we review defendant's request for the OPS files of the three other officers as a new request.

¶ 73 Defendant has not offered any evidence or suggestion that the review of OPS files would yield any results. Defendant's request to engage in discovery is premised on his allegation of a false promise of leniency made by Detectives Chambers and Perez and the presence of all the officers in the interview room when Lloyd was allowed to threaten defendant. Both detectives testified at defendant's suppression hearing and denied defendant's allegations. The trial court

found their testimony to be more credible than defendant's testimony. Defendant has failed to offer anything to dispute the detectives' testimony and provide good cause to allow a review of any OPS complaints filed against the detectives. Further, as to Officer Cronin, defendant offers no allegation of misconduct other than his mere presence in the interrogation room while Lloyd threatened defendant, and Detective Chambers denied that Officer Cronin ever participated in any questioning of defendant. Defendant has not offered a single case or affidavit to support a finding of good cause to allow this request. As the trial court held, defendant's request is speculative and a fishing expedition. Absent any basis to show good cause for the discovery request, the trial court did not abuse its discretion in denying defendant's discovery request.

¶ 74    In a related argument, defendant argues that his trial and appellate counsel were ineffective for failing to ensure that the trial court reviewed OPS files for all four officers. However, defendant cannot make a substantial showing of ineffective assistance under *Strickland*. The basis of defendant's ineffectiveness claims is that his prior attorneys did not make sure that the trial court reviewed OPS files regarding the police officers other than Detective Kato. As we have already discussed, the record does not definitively disclose what was requested by defendant on remand, and the parties and the trial court proceeded with requests to view OPS files regarding Detective Kato. Defendant fails to show how the decision to proceed in this manner prejudiced him, nor does defendant specifically argue how he was prejudiced. Instead, defendant essentially restates his argument that the trial court erred in not reviewing OPS files for the other officers with the additional note that his attorneys should have ensured that review. Defendant has not asserted how any perceived failure to ensure review caused him prejudice such that the result of the proceeding would have been different. Defendant's claim of ineffective assistance cannot stand without a substantial showing that counsels' actions prejudiced defendant. Accordingly, the trial court did not err in dismissing this claim.

¶ 75    Defendant next contends that his appellate counsel was ineffective for failing to raise the denial of his motion to quash arrest on direct appeal. According to defendant, the State failed to independently establish probable cause to arrest defendant based on the statement from Clark, because Clark was unreliable, gave inconsistent statements, and was part of the "criminal milieu." The State maintains that there was probable cause for defendant's arrest and appellate counsel was not ineffective for failing to raise a meritless claim.

¶ 76    The *Strickland* test also applies to claims of ineffective assistance of appellate counsel. *People v. Rogers*, 197 Ill. 2d 216, 223 (2001). A defendant who claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating such failure was objectively unreasonable and that counsel's decision prejudiced defendant. *Id*. Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). Thus, the inquiry as to prejudice requires that the reviewing court examine the merits of the underlying issue, for a defendant does not suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal. *Id*. Appellate counsel's choices concerning which issues to pursue are entitled to substantial deference. *Rogers*, 197 Ill. 2d at 223.

¶ 77    "When reviewing the trial court's ruling on a motion to quash arrest and suppress evidence, we apply a two-part standard of review." *People v. Almond*, 2015 IL 113817, ¶ 55. We afford

great deference to the trial court's findings of fact and will reverse those factual findings only if they are against the manifest weight of the evidence, but review the ultimate legal ruling as to whether the evidence should be suppressed *de novo*. *Id.*

¶ 78    "If a trial court finds that a warrantless arrest was based on probable cause, then the arrest is deemed lawful." *People v. Arnold*, 349 Ill. App. 3d 668, 671 (2004). "Probable cause does not require proof beyond a reasonable doubt but does require more than mere suspicion." *Id.* at 671-72. "Probable cause exists if the totality of the circumstances known to the police at the time of a suspect's arrest is sufficient to warrant a reasonably prudent person to believe the suspect has committed a crime." *Id.* at 672. "Probable cause for a warrantless arrest can be based on information provided by an informant." *Id.* "Third-party information, whether the source of the information is identified or unidentified, an ordinary citizen or a paid informant, a victim, an eyewitness or other witness, is reliable if it bears some indicia of reliability." *Id.* "An indicia of reliability exists when the facts learned through a police investigation independently verify a substantial part of the information learned from the informant." *Id.*

¶ 79    Defendant asserts that at the time of his arrest, the police only had Clark's statement, which was unreliable, and uncorroborated by additional evidence. However, as the State points out, we may consider evidence presented at defendant's trial as well as at the suppression hearing. *Almond*, 2015 IL 113817, ¶ 55. The State maintains that Clark's statement was corroborated. In addition to defendant, Clark identified several other men as participants in the abduction of Burch and Purham. One of those identified, Derrick Harvey, was arrested the day after the murders and took police officers to where the bodies were located near the railroad tracks near Roosevelt. This evidence was presented at defendant's trial and is consistent with Clark's statement that Burch and Purham were abducted and taken to the railroad tracks, and that Harvey had been a participant in the crimes. Further, Barry Williams, Clark's boyfriend, also gave a statement to an ASA and testified at the grand jury that was consistent with Clark's statement to police involving defendant. We also observe that Clark spoke with the police voluntarily after she informed Burch's girlfriend about his death. Clark admitted her involvement in a gang and her involvement in selling drugs. The trial court was aware of Clark's criminal history and considered it when reaching its decision as to probable cause, and we find no error. Based on this information and evidence, we find the police had probable cause to arrest defendant. Since the police had probable cause to arrest defendant, appellate counsel was not ineffective for failing to raise a nonmeritorious issue on direct appeal.

¶ 80    Finally, defendant argues that his mandatory natural life sentence violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution because the sentence is mandated for all offenders convicted of murder of more than one decedent without consideration of age or level of culpability. Defendant also asserts that the sentence is invalid as applied to him because of his age and minimal involvement in the commission of the crimes. The State maintains that defendant's mandatory natural life sentence is constitutional, both facially and as applied.

¶ 81    Defendant bases his constitutional challenge on several recent United States Supreme Court decisions. See *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012).

> "In *Roper*, the Supreme Court held that the eighth amendment prohibits the death penalty for juvenile offenders. *Roper*, 543 U.S. at 568. The Court reasoned that the 'death penalty is reserved for a narrow category of crimes and offenders,' and that

'juvenile offenders cannot with reliability be classified among the worst offenders.' *Id.* at 569. In *Graham*, the Supreme Court held that the eighth amendment forbids a sentence of life without the possibility of parole for juveniles who did not commit homicide. *Graham*, 560 U.S. at 74 ***. The Court said that, although the state is not required to release a juvenile during his natural life, the state is forbidden 'from making the judgment at the outset that those offenders never will be fit to reenter society.' *Id.* at 75 ***. *** In *Miller*, the Supreme Court held that the eighth amendment prohibits a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, including those convicted of homicide. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. The Court stated that a judge must have the opportunity to look at all of the circumstances involved before determining that life without the possibility of parole is the appropriate penalty. See *id.* at ___, 132 S. Ct. at 2469." *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 48.

¶ 82    Because defendant acted as a lookout during the commission of the murders, he was found guilty under a theory of accountability, which mandates that all participants of common design are considered equally responsible. See 720 ILCS 5/5-2(c) (West 1998). Defendant was sentenced to mandatory natural life under section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998). Section 5-8-1(a)(1)(c)(ii) mandates a term of natural life for persons 17 years or older at the time of the commission of the murder and are found guilty of murdering more than one victim. *Id.*[2]

¶ 83    We first consider defendant's contention that his sentence is unconstitutional as applied to his case. Defendant points out that he was 19 years old at the time of commission of the murders, was minimally culpable, and had no prior violent criminal history, but he received a mandatory natural life sentence without the consideration of these mitigating factors.

¶ 84    We preface our consideration of this issue by acknowledging that according to eyewitnesses, defendant was present when the victims were surrounded and forced into a vehicle at gunpoint. The eyewitnesses also testified that defendant was armed at this time. In his statement to ASA Pandit, defendant admitted that he acted as a lookout when the victims were shot. Defendant's role made him accountable for the murders and cannot be discounted.

¶ 85    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "While courts of review are generally reluctant to override the judgment of the General Assembly with respect to criminal penalties [citation], it is also true that when defining crimes and their penalties, the legislature must consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense [citation]." (Internal quotation marks omitted.) *People v. Miller*, 202 Ill. 2d 328, 338 (2002). "With regard to the statute at issue, we have recognized that the legislature considered the possible rehabilitation of an offender who commits multiple murder[s], and the seriousness of that offense, in determining that a mandatory minimum sentence of natural life imprisonment is appropriate for the offense of multiple murders." *Id.*

_____

[2]Public Act 99-69 recently amended section 5-8-1(a)(1)(c)(ii) to provide for a mandatory life sentence for a person who has attained the age of 18 and was found guilty of murdering more than one victim. Pub. Act 99-69, § 10 (eff. Jan. 1, 2016) (amending 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2014)).

"We have recognized three different forms of proportionality review. A statute may be deemed unconstitutionally disproportionate if (1) the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community; (2) similar offenses are compared and the conduct that creates a less serious threat to the public health and safety is punished more harshly; or (3) identical offenses are given different sentences." *Id.*

¶ 86       In *Miller*, the supreme court considered whether a mandatory sentence of natural life violated the proportionate penalties clause when applied to a juvenile found guilty under an accountability theory. *Id.* at 337. The *Miller* court reviewed the question under the first theory, whether the sentence shocked the moral sense of the community. *Id.* at 338-39. The court noted that the sentence was imposed based on the convergence of three statutes, the automatic transfer of juveniles 15 or 16 years old charged with murder to criminal court (705 ILCS 405/5-4(6)(a) (West 1996)), the accountability statute (720 ILCS 5/5-2(c) (West 1996)), and the mandatory natural life sentencing statute (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)). *Miller*, 202 Ill. 2d at 340.

¶ 87       The *Miller* court held that the defendant's sentence was unconstitutional as applied to him.

"Accordingly, we hold that the penalty mandated by the multiple-murder sentencing statute as applied to this defendant is particularly harsh and unconstitutionally disproportionate. We agree with defendant that a mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole–the same sentence applicable to the actual shooter. Our decision does not imply that a sentence of life imprisonment for a juvenile offender convicted under a theory of accountability is never appropriate. It is certainly possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate." *Id.* at 341.

¶ 88       The supreme court further reasoned:

"However, the convergence of the Illinois transfer statute, the accountability statute, and the multiple-murder sentencing statute eliminates the court's ability to consider any mitigating factors such as age or degree of participation. A life sentence without the possibility of parole implies that under any circumstances a juvenile defendant convicted solely by accountability is incorrigible and incapable of rehabilitation for the rest of his life. The trial judge in this case did not agree with such a blanket proposition. We also decline to find that the sentence mandated by the multiple-murder sentencing statute in this case satisfies the proportionate penalties clause of the Illinois Constitution." *Id.* at 342-43.

¶ 89       While defendant was not a juvenile at the time of the offense, his young age of 19 is relevant in consideration under the circumstances of this case. As in *Miller*, defendant's sentence involved the convergence of the accountability statute and the mandatory natural life sentence. We acknowledge that the offender in *Miller* was 15, never handled a firearm, and had

less than a minute to consider the implications of his participation. In the present case, the State's evidence at trial established that defendant was not present at the scene of the murder, but merely acted as a lookout near the railroad tracks. There was no evidence that defendant helped to plan the commission, but instead took orders from higher ranking UVL members. While defendant had a greater involvement in the commission of the offenses than the defendant in *Miller*, after considering the evidence and defendant's relevant culpability, we question the propriety of mandatory natural life for a 19 year old defendant convicted under a theory of accountability. Although defendant acted as a lookout during the commission of the crime and was not the actual shooter, he received a mandatory natural life sentence, the same sentence applicable to the person who pulled the trigger.

¶ 90    We also observe that the Supreme Court in *Miller*, *Graham* and *Roper* considered the continuing brain development in adolescents.

> "Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most severe punishments.' *Graham*, 560 U.S., at [68] ***. Those cases relied on three significant gaps between juveniles and adults. First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569 ***. Second, children 'are more vulnerable ... to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid*. And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' *Id.*, at 570 ***.
>
> Our decisions rested not only on common sense–on what 'any parent knows'–but on science and social science as well. *Id.*, at 569 ***. In *Roper*, we cited studies showing that ' "[o]nly a relatively small proportion of adolescents" ' who engage in illegal activity ' "develop entrenched patterns of problem behavior." ' *Id.*, at 570 *** (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003)). And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'–for example, in 'parts of the brain involved in behavior control.' 560 U.S., at [68] ***. We reasoned that those findings–of transient rashness, proclivity for risk, and inability to assess consequences–both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' *Id.*, at [68] *** (quoting *Roper*, 543 U.S., at 570 ***)." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464-65.

¶ 91    As the *Graham* Court noted, "[e]ven if the punishment has some connection to a valid penological goal, it must be shown that the punishment is not grossly disproportionate in light of the justification offered." *Graham*, 560 U.S. at 72. The *Roper* Court stated, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573 (citing Lawrence Steinberg & Elizabeth Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity,*

*Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1014-16 (2003)).

¶ 92 "It is widely recognized by many legal scholars that the United States Supreme Court is moving rather quickly towards abolishing life without parole sentences for juvenile offenders entirely." Maureen Dowling,Note, *Juvenile Sentencing in Illinois: Addressing the Supreme Court Trend Away From Harsh Punishments for Juvenile Offenders*, 35 N. Ill. U. L. Rev. 611, 619 (2015).

> "There are several parts of the analyses of each case that point to this inevitable shift. First, each case acknowledges that the decisions are directly contrary to our historical understanding of juvenile sentencing. The Court rejects the notion of looking at sentencing 'through a historical prism' in favor of the evolving moral and ethical standards of society. This opens up the Court to abolish life without parole sentences for juveniles, even though traditionally it is a widely practiced and accepted sentence. Second, each opinion makes it clear that simply because a majority of state sentencing statutes do not currently agree with the decisions, this will not affect the outcome. This argument goes hand-in-hand with the Court's rejection of historical sentencing standards. Again, the Court has left open the possibility of abolishing the harshest sentence available to juveniles. Finally, the Court repeatedly emphasizes the differences between juveniles and adults as an explanation for why each should be sentenced differently. The continued focus on these differences further bolsters the argument for abolishing life sentences without the possibility of parole for juveniles." *Id.* at 619-20.

¶ 93 "The Supreme Court has followed a clear path away from life without parole sentences. Following the reasoning laid out by the Court in these three cases, it can easily be seen how the Court would deal with abolishing the sentence entirely." *Id.* at 627. As this note observes, several states have responded to *Miller* by imposing "*de facto*" life sentences through lengthy term-of-years sentences. *Id.* at 620. However, "These de-facto life sentences are not consistent with the language or analysis found in both *Miller* and *Graham*. A prison sentence that will last sixty or more years does not allow courts to show juvenile offenders any clemency. Furthermore, despite the lengthy discussion about the differences between adults and juveniles, de-facto life sentences do not give courts any opportunity to take the differences into account when determining a sentence." *Id.* at 621. We also observe that the Iowa Supreme Court in *State v. Null*, 836 N.W.2d 41 (Iowa 2013) expanded the principles of *Miller* to hold mandatory minimum sentences for juvenile offenders to be unconstitutional. The *Null* court believed that

> "while a minimum of 52.5 years imprisonment is not technically a life-without-parole sentence, such a lengthy sentence imposed on a juvenile is sufficient to trigger *Miller*-type protections. Even if lesser sentences than life without parole might be less problematic, we do not regard the juvenile's potential future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of *Graham* or *Miller*. The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*, 560 U.S. at ___ ***." *Id.* at 71.

¶ 94    Although the Court in *Roper* delineated the division between juvenile and adult at 18, we do not believe that this demarcation has created a bright line rule. See *Roper*, 543 U.S. at 574 ("Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. *** The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.").

¶ 95    Rather, we find the designation that after age 18 an individual is a mature adult appears to be somewhat arbitrary, especially in the case at bar. Recent research and articles have discussed the differences between young adults, like defendant, and a fully mature adult. "Research in neurobiology and developmental psychology has shown that the brain doesn't finish developing until the mid-20s, far later than was previously thought. Young adults are more similar to adolescents than fully mature adults in important ways. They are more susceptible to peer pressure, less future-oriented and more volatile in emotionally charged settings." Vincent Schiraldi & Bruce Western, *Why 21 year-old offenders should be tried in family court*, Wash. Post (Oct. 2, 2015), www.washingtonpost.com/ opinions/time-to-raise-the-juvenile-age-limit/2015/10/02/948e317c-6862-11e5-9ef3-fde1825 07eac_story.html.

> "The young adult brain is still developing, and young adults are in transition from adolescence to adulthood. Further, the ongoing development of their brains means they have a high capacity for reform and rehabilitation. Young adults are, neurologically and developmentally, closer to adolescents than they are to adults. Prosecuting and sentencing young adults in the adult criminal justice system deprives them of their chance to become productive members of society, leads to high recidivism rates, and high jail and prison populations, and increased costs to society through subsequent incarceration and unemployment." Kanako Ishida, *Young Adults in Conflict with the Law: Opportunities for Diversion*, Juvenile Justice Initiative, at 1 (Feb. 2015), *available at* jjustice.org/wordpress/wp-content/uploads/Young-Adults-in-Conflict-with-the-Law-Opportunities-for-Diversion.pdf.

¶ 96    The thesis of these articles is to illustrate the need to expand juvenile sentencing provisions for young adult offenders. Both articles noted that several European countries have already extended juvenile justice to include young adults. In Germany, all young adults ages 18 to 21 have been tried in juvenile court and the judges have an option to sentence them as a juvenile, if a consideration of the offender's personality and environment indicate that his psychological development was as a juvenile. *Id.* at 2. Sweden allows for young adults to be tried in juvenile court until their 25th birthday, and young adults 18 to 24 receive different treatment than adults. "For instance, statutory minimum sentences cannot be applied for young people age 20 or under." *Id.* at 3. The Netherlands has extended juvenile alternatives for young adults ages 18 to 21. *Id.*

¶ 97    We also point out that Illinois raised the age for a delinquent minor. Prior to January 1, 2014, a person who committed a felony prior to his or her 17th birthday was considered a delinquent minor. See 705 ILCS 405/5-105(3) (West 2012). However, Public Act 98-61 changed the definition of a delinquent minor to be, "any minor who prior to his or her 18th

birthday has violated or attempted to violate, regardless of where the act occurred, any federal, State, county or municipal law or ordinance." Pub. Act 98-61, § 5 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-105(3) (West 2012)).

¶ 98    As discussed in the Northern Illinois University Law Review note, the Supreme Court of Wyoming compiled a list of factors taken from *Miller* to consider in sentencing juveniles.

> "During a postconviction sentencing hearing, a trial court should scrutinize the following factors before sentencing a juvenile offender: (a) the character and history of the juvenile offender and the specific circumstances of the crime; (b) the background and emotional and mental development of the juvenile offender; (c) the offender's age and characteristics that go along with it including immaturity and ability to appreciate risks; (d) the juvenile's family and home environment; (e) the circumstances of the crime, the extent to which the juvenile was involved, and the extent to which peer or familial pressure may have factored into the juvenile's participation; (f) 'the juvenile's relative inability to deal with police and prosecutors or to assist his own attorney'; and (g) the offender's potential for rehabilitation." Dowling, *supra*, at 634 (citing *Bear Cloud v. State*, 2013 WY 18, ¶ 42, 294 P.3d 36 (Wyo. 2013), quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467-68).

¶ 99    " '[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his culpability." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982)). As the Supreme Court observed in *Graham*, "Life without parole is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." *Graham*, 560 U.S. at 70.

¶ 100    "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. Under Illinois law, the harshest form of punishment is a mandatory life sentence. See 730 ILCS 5/5-8-1(a) (West 2014). The trial court is not afforded any discretion if an offender is found guilty of triggering offenses, such as, the death of more than one person. See 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2014). However, when the death penalty still existed in Illinois, there were several statutory guidelines that had to be met before such a sentence could be imposed. See 720 ILCS 5/9-1 (West 2010). The lack of discretion afforded the trial court for the imposition of a mandatory life sentence is especially relevant when the defendant is a young adult, over 18, but still not considered a fully mature adult.

¶ 101    These considerations are significant in the instant case and support defendant's argument that the mandatory natural life sentencing statute is unconstitutional as applied to him. Turning to the case at bar, while clearly no longer a juvenile, defendant, at age 19 years and 2 months, was barely a legal adult and still a teenager. His youthfulness is relevant when considered alongside his participation in the actual shootings. Defendant's presentence investigation report showed that his only prior offenses were possession of a controlled substance with intent to deliver. Defendant did not have a criminal history of violent crimes. The sentencing hearing also disclosed that defendant never knew his father, he was raised by his maternal grandmother, and that his mother died when he was 18. Defendant attended high school

through the twelfth grade, however, he never graduated. At the time defendant was sentenced, the death penalty was still in place in Illinois. Although the trial judge found defendant eligible for the death penalty, he concluded that there were "sufficient mitigating factors to preclude the imposition of the death penalty." While some of these mitigating factors were before the trial court when it declined to impose the death penalty, they were not available to be considered before imposing a mandatory natural life sentence. The court's ability to take any factors into consideration was negated by the mandatory nature of defendant's sentence. The trial court was also precluded from considering the goal of rehabilitation in imposing the life sentence, which is especially relevant in defendant's case. Given defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior violent convictions, we find that defendant's mandatory sentence of natural life shocks the moral sense of the community.

¶ 102    Our conclusion is not meant to diminish in any way of the seriousness of the crimes, specifically two convictions for murder and two convictions for aggravated kidnapping. We recognize defendant remains culpable for his participation. However, we believe that defendant is entitled to a new sentencing hearing in which the trial court has the ability to consider the relevant mitigating factors prior to imposing a sentence of such magnitude. Accordingly, we hold that defendant's sentence violates the proportionate penalties clause of the constitution as applied to him. We vacate defendant's sentence of natural life and remand for a new sentencing hearing.

¶ 103    Since we have held that the proportionate penalties clause is unconstitutional as applied to defendant, we need not address defendant's arguments that the impositions of a mandatory life sentence was facially unconstitutional under the eighth amendment and the proportionate penalties clause. We do not make a recommendation to the trial court on remand as to the appropriate sentence. That determination is best left to the trial court who presided over defendant's trial proceedings. However, as pointed out above, we question the statutory requirement to impose a mandatory life sentence on a culpable lookout compared to the perpetrator who pulled the trigger and took more than one life without any consideration of any mitigating factors. The statute in its current form takes away the trial court's discretion and ability to consider any mitigating factors in this case.

¶ 104    Based on the foregoing reasons, we affirm the dismissal of defendant's postconviction petition, vacate defendant's sentence, and remand for a new sentencing hearing in accordance with this decision.

¶ 105    Affirmed in part, vacated in part, remanded.

¶ 106    JUSTICE GORDON, concurring in part and dissenting in part.

¶ 107    I concur with the majority that we must vacate defendant's mandatory sentence of natural life without parole. However, for the reasons explained below, I must respectfully dissent from the majority's decision to affirm the trial court's second-stage dismissal of defendant's postconviction petition.

¶ 108    I would remand for a third-stage evidentiary hearing on defendant's claim of actual innocence. Defendant argues that he has made a substantial showing of actual innocence based on the newly discovered evidence of a key State witness's recantation of her trial testimony

and her swearing that she was present at the time of the kidnapping and that she never saw defendant there.

¶ 109        I quote Clark's affidavit in full:

"I, Eunice Clark, having first been duly sworn, depose and state as follows:

1. This affidavit is made of my own personal knowledge. If I were called to testify, I would be competent to do so and would testify to the facts set forth herein.

I, Eunice Clark, as a witness to the kidnapping of Stan Burch and Michael Purham on the date of September 13th 1993, in the late morning hours in the vicinity of Springfield St. and Fillmore St. located in Chicago, Illinois.

Further states that I never saw Antonio House kidnap or conspire to kidnap Stan Burch and Michael Purham nor did I see Antonio House with a weapon.

On October 12th 1993, I was never confronted by Antonio House neither has Mr. House threaten me or cause me bodily harm. To my personal knowledge Antonio House['s] name was only mention[ed] because he was a worker for Ted.[3]

Further affiant sayeth not."

¶ 110        Defendant was convicted of the aggravated kidnappings and first degree murders of Stanton Burch and Michael Purham based primarily on the testimony of Eunice Clark. Clark testified at trial that defendant was with a group of Unknown Vice Lord gang members who kidnapped Burch and Purham. She testified that this group encircled Burch and Purham on the street and forced them at gunpoint into the back of Ted's vehicle. While Barry Williams placed defendant at the scene of the kidnapping in a prior statement and in grand jury testimony, at trial Williams could not recall much of his prior statement or grand jury testimony. *Supra* ¶ 45.

¶ 111        Now, Clark swears in her affidavit that she never saw defendant. I believe this affidavit makes the substantial showing needed to proceed to a third-stage evidentiary hearing. Our supreme court has observed, "[w]e deem it appropriate to note here that the United States Supreme Court has emphasized that such claims must be supported 'with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial.' " *People v. Edwards*, 2012 IL 111711, ¶ 32 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). Here we have an eyewitness account that was not presented at trial, by an eyewitness whom the State deemed trustworthy enough to call as a witness. Whether her current statement is sufficiently trustworthy is a credibility determination that is best resolved in the first instance by the trial court at an evidentiary hearing. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 66 (the trial court is in the best position to make credibility determinations); *People v. Davis*, 378 Ill. App. 3d 1, 13 (2007) (while the trial judge is able to hear a witness's "tone of voice and pauses, and observe his body language as he delivered his answer, that information is obviously missing from the dry transcript before this reviewing court"). Thus, I believe we must remand for a third-stage evidentiary hearing.

¶ 112        For these reasons, I must respectfully dissent.

_____

[3]"Ted" was one of the leaders of the sects of the Unknown Vice Lords.