2021 IL App (2d) 190796-U
No. 2-19-0796
Order filed September 22, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03-CF-2253 |
| JOSE L. CRUZ, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court properly denied defendant leave to file a successive post-conviction petition alleging that his 47-year sentence for a murder he committed when he was 21 years of age violated the proportionate-penalties clause of the Illinois Constitution. Defendant did not establish cause for failing to bring his claim in his initial post-conviction petition. His proposed petition relied on case law decided years after he filed his initial postconviction petition, but those decisions merely provided additional support for principles that were well established when defendant filed that earlier petition.

¶ 2    Defendant, Jose L. Cruz, appeals the denial of his motion for leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). Defendant's proposed petition asserted, in relevant part, that his 47-year prison sentence

for first-degree murder, committed when he was almost 22 years old, constituted a *de facto* life sentence and violated, *inter alia*, the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). On appeal, defendant contends that the trial court's decision to deny leave to file the successive post-conviction petition was erroneous because he demonstrated the requisite "cause" and "prejudice" under section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2018)) to excuse his failure to raise his claim in his initial postconviction petition. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by indictment with eight counts of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2002)). The charges stemmed from the June 21, 2003, stabbing death of Elda Portela, defendant's brother's widow. At the time of the offense, defendant, who was born on August 29, 1981, was a citizen of Honduras and living in the United States illegally. Another individual, Arnulfo Martinez, was also charged in Portela's death. Defendant, who is a native Spanish speaker, was assisted by an interpreter throughout the proceedings.

¶ 5     On May 3, 2004, defendant entered a negotiated plea agreement with a sentencing cap. Under the agreement, defendant pleaded guilty to count I of the indictment. In exchange, the State *nolle prosed* the remaining seven counts and agreed to a sentencing cap of 55 years. At the hearing on the plea agreement, the court informed defendant that at the end of his prison term he would be subject to a three-year term of mandatory supervised release (MSR). Defendant told the court that he understood the charges, possible sentences, and rights being waived. When asked by the court whether he had stabbed Portela, defendant responded affirmatively. As a factual basis for the plea, the State told the court that Portela had "in excess of 20 stab wounds," "her internal organs *** were falling out of her body," she lost "an incredible amount of blood," and she died at the hospital.

The court, finding the plea knowing, intelligent, and voluntary, accepted the plea agreement and ordered a presentence investigation (PSI) report.

¶ 6    According to the PSI report, defendant's brother had been murdered in Central America and defendant believed that Portela had been involved in that crime. Defendant killed Portela to avenge his brother's death. Defendant also stated that he had consumed a substantial quantity of alcohol before the killing. Portela disclosed defendant's identity as her attacker to police before she permanently lost consciousness and died. After attacking Portela, defendant fled the scene and disposed of clothing, gloves, and a knife, which were later recovered from a garbage dumpster. Defendant was arrested the day after the occurrence.

¶ 7    The PSI report further stated that defendant had no prior criminal history apart from an immigration hold. He completed two years of school in Honduras before he started working at the age of eight years. The PSI report further indicated that after being arrested, defendant submitted to a psychological assessment conducted by Dr. James Choca. Dr. Choca administered various tests to defendant, including a modified Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). Dr. Choca modified the WAIS-III by translating "all instructions and items into Spanish" and changing items in two subsets "to make them more culturally fair." On the modified WAIS-III, defendant obtained a full-scale IQ of 63. According to Dr. Choca, this placed defendant in the "mild mentally retarded range."

¶ 8    After learning of Dr. Choca's finding, the trial court ordered Dr. John V. Dunne, Ph.D., to perform a psychological evaluation to determine whether defendant had been fit to enter his guilty plea. Dr. Dunne interviewed defendant with the assistance of an interpreter. He did not administer any intelligence tests, as none were available in Spanish. Based on his interview with defendant, Dr. Dunne concluded that defendant appeared "mildly to moderately depressed." He further opined

that although previous testing indicated intellectual functioning as low as the range of mild mental retardation, defendant's mental condition impaired neither his ability to understand the nature of the proceedings he would be facing nor his capacity for cooperating with an attorney and assisting in his defense. As such, Dr. Dunne concluded that defendant made an informed decision to enter a negotiated plea and that he was fit to be sentenced. Because Dr. Dunne was unable to perform an IQ test on defendant, he offered Dr. Nydia Welles, a Spanish-speaking psychologist, as a resource. Dr. Welles administered the Escala de Inteligencia de Wechsler para Adultos (EIWA), which is a Spanish translation of the Wechsler Intelligence Test for Adults. On the EIWA test, defendant obtained a verbal IQ of 84, a performance IQ of 85, and a general IQ of 84. Based on these scores, Dr. Welles concluded that defendant's intelligence ranked in the "low normal level/dull."

¶ 9    Defendant's sentencing hearing was held on December 20, 2004. At the hearing, the parties presented the PSI report, the evaluations of Dr. Choca and Dr. Welles, letters from defendant's family members, photographs of Portela after the stabbing, and victim impact statements from Portela's child and a family member. The court also heard the testimony of Dr. Choca and two of defendant's siblings.

¶ 10    At the sentencing hearing, Dr. Choca discussed his evaluation. Dr. Choca testified that he interviewed defendant on two occasions in 2003. During the first interview, defendant worried about disclosing information about the murder without speaking with his attorney, so Dr. Choca began with some testing. Dr. Choca administered the WAIS-III, Millon Clinical Multiaxial Inventory-III (MCMI-III), Rorschach Inkblot Test, and the Thematic Apperception Test.

¶ 11    Dr. Choca testified the WAIS-III is an IQ test used to determine an individual's intellectual ability. Dr. Choca translated the instructions and some of the testing items of the WAIS-III into

Spanish to make the test "more culturally fair." Dr. Choca stated there was no Spanish-language test available at that time. Dr. Choca did not believe his translation jeopardized the validity of the test. He stated that before the development and release of a standardized Spanish-language test, which occurred after Dr. Choca administered his version to defendant, it was standard practice to administer a translated version of the IQ test. Defendant's performance on the WAIS-III resulted in a full-scale score of 63, which was in the "mental defective range" and indicated a "deficit in terms of intellectual function." Dr. Choca opined a lack of formal schooling and one's cultural background could impact an IQ score. Dr. Choca testified that a low IQ limits a person's perception of what happens around him or her and his or her capacity to develop options or solutions to problems. Defendant's MCMI-III personality test results did not indicate any anti-social, aggressive, or expressive personality traits, but it did note a mild elevation on the anxiety and desirability scales.

¶ 12    Dr. Choca conducted a second interview, at which time defendant spoke of the events surrounding the offense. From this interview, Dr. Choca estimated defendant was very limited in his ability to look at different options, evaluate their consequences, and choose the best option. Dr. Choca opined defendant could not weigh factors in an objectively reasonable manner. Dr. Choca also opined defendant's cultural issues impacted his course of conduct. Defendant spoke about Honduras and the expectation that he defend his family's honor, taking responsibility for punishing the person who caused his brother's death. Dr. Choca opined defendant was a follower and susceptible to external pressures from his accomplice (Martinez) and a third person who provided Portela's whereabouts on the night of the killing. Dr. Choca noted defendant had not acted on his thoughts to avenge his brother's death before two others became involved, but defendant "had always been aware of the risks he would be taking in attempting to kill *** Portela."

¶ 13    Although the evaluation indicated defendant's low intellectual ability limited his capacity to plan, Dr. Choca was unaware defendant conducted surveillance of Portela for a month before the offense, sought the assistance of Martinez to tell him when Portela planned to leave the country, and told Martinez to keep the getaway truck running. Considering the actions defendant took before and after the offense, Dr. Choca believed that the murder was premeditated, but he maintained defendant's level of ability did not provide a capacity to see the consequences and repercussions of the crime for himself and the community. Nevertheless, Dr. Choca conceded that defendant's actions of wearing gloves during the offense and disposing of the gloves and the murder weapon in a dumpster showed some acknowledgment of the consequences and premeditation.

¶ 14    Dr. Choca was aware Dr. Welles administered the EIWA test. Dr. Choca testified that the EIWA test was developed in the 1950s and was the only available IQ test in Spanish at the time of defendant's evaluation. Although used at one time, some literature indicated the EIWA test inflated the test-taker's intellectual ability, and evaluators stopped using it. One article found the test performed so poorly, the author deemed it unethical to give the test. Nevertheless, Dr. Choca had used the EIWA test before. For defendant, Dr. Choca translated the WAIS-III into Spanish. He opined that using his unstandardized translation was better than using the EIWA test. Since defendant took the two IQ tests, a Spanish version of the WAIS-III became available. Ultimately, Dr. Choca opined defendant was mildly retarded.

¶ 15    At the request of the State, Dr. Welles conducted a psychological evaluation to obtain defendant's IQ level. Like Dr. Choca's evaluation, in her report, Dr. Welles noted defendant's minimal education, his culture, and the primitive conditions of his childhood. Dr. Welles also noted that defendant expressed "sincere guilt for what he did." On the EIWA, defendant had a full-scale

IQ of 84, "indicating that his intelligence ranks in the Low Normal Level/Dull." Dr. Welles cautioned that the EIWA test was obsolete and generous in IQ results compared to the most modern English version. Specifically, she estimated the IQ results might be six to eight points in favor of Spanish norms. Dr. Welles recognized defendant's low scores on the subtests raised questions about his social development.

¶ 16     Defendant's brother and sister also testified at the sentencing hearing. They recounted their relationship with defendant, defendant's life in Honduras before coming to the United States, his schooling, his work history, and his demeanor.

¶ 17     In argument, the State, citing the heinous nature of the crime, asked the court to impose a sentence of 55 years, the maximum under the plea agreement. In response, defense counsel asserted defendant's low IQ and cultural issues caused him to function in a "cultural warp." Defense counsel claimed defendant acted under strong provocation, the crime was induced or facilitated by another, defendant had no history of delinquency or criminal activity, the offense was unlikely to recur, defendant was unlikely to commit another crime, and imprisonment would have an economic impact on defendant's parents in Honduras. Further, defense counsel maintained that defendant was "mentally retarded" and because defendant was "still young *** there should be light at the end of the tunnel." In rebuttal, the State challenged defense counsel's characterization of defendant as intellectually disabled.

¶ 18     After listening to the testimony presented, reviewing the evidence presented, and considering the statutory and non-statutory factors in aggravation and mitigation, the court found the murder of Portela to be "barbaric and inhuman." The court found defendant's act of repeatedly plunging a knife into Portela spoke of "a cold and calculated heart" despite the absence of an anti-social diagnosis. The court further found defendant's planning and scheming called into question

Dr. Choca's conclusion that defendant was retarded. The court did not find Dr. Choca's conclusion credible. Instead, the court "put more weight in the findings of Dr. Dunne [and] Dr. Welles, that [defendant] is not retarded." In statutory mitigation, the court found applicable the factors that defendant's conduct was induced or facilitated by others and that he had no prior criminal history. However, in aggravation, the court considered the way in which the crime was committed and the necessity in deterring others. The court agreed to be bound by the 55-year cap and sentenced defendant to 47 years' imprisonment.

¶ 19    Thereafter, defendant filed a *pro se* motion to withdraw his guilty plea alleging, *inter alia*, (1) trial counsel was ineffective for failing to file a motion to suppress and for leading defendant to believe his sentence would be near 30 years and (2) his ability to understand the proceedings was impaired because he was unable to understand the interpreter. The trial court appointed counsel, who filed an amended motion to withdraw the guilty plea and a motion to reconsider sentence. Following a hearing at which defendant testified, the trial court denied the motion to withdraw the guilty plea finding that the motion was baseless and defendant was not credible. The court also found the sentence was appropriate where the court fully considered the factors in aggravation and mitigation raised in the motion and at the sentencing hearing. As such, it denied defendant's post-sentencing motion. Defendant appealed.

¶ 20    On appeal, defendant challenged the denial of his motion to withdraw his guilty plea where the record failed to establish the interpreter's identity, qualifications, or ability to communicate in Honduran Spanish, or that the interpreter was sworn in. Due to his low IQ, defendant claimed it was particularly important to have the assistance of a skilled interpreter. This court affirmed the judgment on appeal. *People v. Cruz*, 372 Ill. App. 3d 556, 562 (2007). We initially noted that because defendant did not raise the issue of the interpreter's qualifications in the trial court, his

claim was subject to review only if it rose to the level of plain error. *Cruz*, 372 Ill. App. 3d at 559. We then concluded that Dr. Dunne's evaluation confirmed defendant understood the ramifications of his plea. *Cruz*, 372 Ill. App. 3d at 561. Because defendant sufficiently comprehended the consequences of the plea, this court found no plain error in the trial court's failure to inquire into the interpreter's identity and qualifications or to place her under oath. *Cruz*, 372 Ill. App. 3d at 560-562.

¶ 21    In March 2008, defendant filed a *pro se* postconviction petition. In his petition, defendant raised claims of ineffective assistance of trial and appellate counsel. Specifically, he alleged trial counsel failed to advise him of his right to a bench or jury trial and to confront witnesses against him and failed to challenge his arrest in a suppression motion. Defendant claimed appellate counsel failed to argue he was unable to understand the trial court's guilty plea admonishments. The trial court summarily dismissed the petition as frivolous and patently without merit. The court found there was no factual support or basis for a finding of prejudice to support his ineffective assistance of trial counsel claims. Moreover, it found defendant's ineffective assistance of appellate counsel claim was barred by *res judicata*. Defendant appealed. In a summary order, this court granted the appellate defender leave to withdraw pursuant to *People v. Finley*, 418 U.S. 551 (1987), and *People v. Lee*, 251 Ill. App. 3d 63 (1993). See *People v. Cruz*, No. 2-08-0597 (2009) (unpublished summary order under Illinois Supreme Court Rule 23(c)(2)).

¶ 22    In July 2012, defendant filed a *pro se* complaint for mandamus pursuant to section 14-101 of the Code of Civil Procedure (735 ILCS 5/14-101 *et seq*. (West 2012)). In the complaint, defendant averred that that there was a misinterpretation of the term of MSR such that his three-year MSR term should be part of his 47-year sentenced. The trial court found defendant was advised of the MSR term at the time of the negotiated plea and dismissed the complaint.

¶ 23 On August 28, 2018, defendant moved for leave to file a successive postconviction petition pursuant to section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2018)). In his motion, defendant maintained that his 47-year prison sentence was unconstitutional as it violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII), the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), and his rights under the Universal Declaration of Human Rights (see https://www.un.org/en/about-us/universal-declaration-of-human-rights (last visited August 26, 2021)). Defendant averred his psychological assessment determined he was mildly retarded with an IQ of 63, which created a statutory presumption of retardation under section 114-15 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-15 (West 2018)). Defendant claimed there was new precedent validating "science" and "social science" that was not previously available regarding sentences imposed on adolescent offenders between 18 and 24 years of age "with evidence of 'immature brain development' and 'deficiencies.' "

¶ 24 Primarily, defendant relied on *Miller v. Alabama*, 567 U.S. 460 (2012), *People v. House*, 2015 IL App (1st) 110580, and *People v. Harris*, 2016 IL App (1st) 141744 (*Harris I*), to support his contention that he was a member of the juvenile class for which the trial court was required to consider the mitigating factor of his youth in fashioning his sentence. Because *Miller* and its progeny were unavailable at the time of his first postconviction petition, defendant alleged he showed sufficient cause. Further, defendant alleged he established sufficient prejudice as "there is a reasonable probability that [he] would have received a lesser-sentence within his 'life-expectancy' range had the trial court *been able* to apply this Science and Social Science evidence and considered the individual characteristic[s] enumerated and stated in the (attached) successive petition for post-conviction relief." (Emphasis in original.) He argued a 47-year sentence "for a

'*mentally retarded*' individual with an IQ of 63 as attested by (Dr. James Choco [*sic*]) 'shocks the moral sense of the community.' " (Emphasis in original.) Attached to the motion, defendant provided articles concerning brain imaging, brain activity of those making punishment decisions, international justice programs for individuals up to the age of 25, personality changes throughout adulthood, and proposals for extending juvenile protection.

¶ 25    In the successive petition attached to the motion for leave, defendant indicated he was 21 years, 10 months, and 23 days old at the time of the offense. He stated that Dr. Choca's psychological assessment concluded he was mildly retarded with an IQ of 63. He argued there was no legitimate penological purpose to sentence a mentally retarded person to a *de facto* life sentence. As such, he asked the court to extend the holding of *Miller* to apply to a 21-year-old offender with evidence of statutorily presumptive mental retardation. In his petition, he claimed the trial court was "precluded" from considering and according adequate weight to his mitigating factors and alleged the minimum sentence was beyond his estimated life expectancy.

¶ 26    In denying the motion for leave to file a successive postconviction petition, the trial court made the following findings. First, the court addressed defendant's reliance on *House*, 2015 IL App (1st) 110580 and *Harris I*, 2016 IL App (1st) 141744. The trial court noted that both of those cases relied on *Miller*, 567 U.S. 460 (2012), a case in which the United States Supreme Court held that sentencing a defendant who was under the age of 18 at the time of the offense to a mandatory sentence of life without parole violates the eighth amendment. In *House*, the First District concluded that an 18-year-old defendant's mandatory life sentence violated the proportionate-penalties clause of the Illinois Constitution. *House*, 2015 IL App (1st) 110580, ¶ 102. In *Harris I*, the First District concluded that a 19-year-old defendant's 76-year sentence violated the proportionate-penalties clause of the Illinois Constitution. *Harris I*, 2016 IL App (1st) 141744,

¶ 58. The trial court determined that neither *House* nor *Harris I* supported defendant's eighth amendment argument. The court noted that both cases were "no longer intact" because the Illinois Supreme Court (1) reversed the appellate court's ruling in *Harris I* (*People v. Harris*, 2018 IL 121932 (*Harris II*)) and (2) vacated the appellate court's decision in *House* and remanded the case for reconsideration in light of its decision in *Harris II* (*People v. House*, 2018 IL 122134). Further, the court in *Harris II* noted the *Miller* court's demarcation between juveniles and adults at the age of 18 and found that the eighth amendment did not protect a 19-year old from a *de facto* life sentence. Further, the trial court noted that in *People v. LaPointe*, 2018 IL App (2d) 160903, ¶¶ 44, 47, this court rejected the suggestion in *House* that *Miller* applied to defendants of age 18 and older. Consequently, the trial court found defendant could not find refuge in *Miller* or the eighth amendment.

¶ 27    As to the proportionate-penalties clause claim, the court noted defendant must show an objective factor that impeded his ability to bring this claim in his original postconviction petition. The court noted that while neither *House* nor *Harris I* had been decided at the time of his initial petition, the absence of those decisions did not prevent defendant from arguing his age and intelligence should mitigate the sentence. To the contrary, the court found defendant did raise these arguments at sentencing. None of the cases upon which defendant relied in his motion would have allowed him to make a better sentencing argument. Moreover, because the record refuted defendant's contention that the trial court was precluded from considering his age and intelligence, defendant did not show prejudice. The court found the record reflected that the trial court considered the mitigation of defendant's youth, intelligence, and background in fashioning the sentence. Thus, the court denied defendant leave to file his successive postconviction petition.

¶ 28    Defendant moved to reconsider. He argued his mental retardation made him a "mental age" juvenile and he should thus be treated as a "chronological age" juvenile. He asserted his mental impairments were "substantially exacerbated" by his youth, so there was little difference between him and a 17-year-old offender. He asked the court to extend the application of *Miller* to him. Based on the evolving case law surrounding *Miller*, which did not exist at the time he filed his original petition, defendant argued he should be given leave to file his successive petition.

¶ 29    The trial court found defendant's motion to reconsider argued the same issues it previously considered. The court reiterated that *Miller* did not apply to an individual who was at least 18 years old at the time of the offense. Because defendant did not present any newly discovered evidence, changes in the law, or errors, the court denied his motion to reconsider. Defendant timely appealed to this court.

¶ 30                                II. ANALYSIS

¶ 31    Defendant argues that the trial court erred in denying him leave to file his successive postconviction petition. Specifically, defendant claims that, as applied to him, his 47-year "*de facto* life sentence" violated the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship")) because it was imposed contrary to the principles for sentencing youthful offenders set forth in *Miller*, 567 U.S. 460.[1] The State responds that this court in *LaPointe*, 2018 IL App (2d) 160903, and *People v.*

_____

[1] As noted earlier, in his August 28, 2018, motion for leave to file a successive postconviction petition pursuant to section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2018)), defendant maintained that his 47-year prison sentence was unconstitutional as it violated the eighth

*Hoover*, 2019 IL App (2d) 170070, rejected arguments similar to the one defendant now advances. The State asks that we continue to adhere to those prior decisions.

¶ 32    The Act provides a method by which a criminal defendant may file a petition challenging his or her conviction or sentence based on a substantial violation of constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2018); *People v. Edwards*, 2012 IL 111711, ¶ 21. Proceedings under the Act are collateral to proceedings on direct appeal and focus on constitutional claims that have not and could not have been previously adjudicated. *People v. Buffer*, 2019 IL 122327, ¶ 12. For that reason, the doctrine of *res judicata* bars issues that were raised and decided on direct appeal, and forfeiture precludes issues that could have been raised but were not. *People v. Dorsey*, 2021 IL 123010, ¶ 31.

¶ 33    The Act contemplates the filing of only one postconviction petition. 725 ILCS 5/122-1(f), 122-3 (West 2018); *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). Because successive petitions impede the finality of criminal litigation, that statutory bar will be relaxed only "when fundamental fairness so requires." *Pitsonbarger*, 205 Ill. 2d at 458. The supreme court has identified two such instances. *Edwards*, 2012 IL 111711, ¶ 22. The first basis is when the defendant raises a claim of actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23. The second

---

amendment of the United States Constitution (U.S. Const., amend. VIII), the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), and the Universal Declaration of Human Rights (see https://www.un.org/en/about-us/universal-declaration-of-human-rights (last visited August 26, 2021)). In this appeal, defendant has abandoned his claims under the eighth amendment and the Universal Declaration of Human Rights. As such, we do not address them in this disposition.

basis is the cause-and-prejudice test set forth in section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2018)). Here, only the cause-and-prejudice test is at issue. Under that test, a defendant may obtain leave of court to file a successive postconviction petition if he or she demonstrates *both* "cause" for the failure to raise the claim in the initial petition *and* that "prejudice" resulted from the failure to raise the claim. *Dorsey*, 2021 IL 123010, ¶ 32; *People v. Britt-El*, 206 Ill. 2d 331, 339 (2002). "Cause" is shown by a defendant identifying an objective factor that impeded his or her ability to raise a specific claim during the initial postconviction proceeding. 725 ILCS 5/122-1(f) (West 2018); *Dorsey*, 2021 IL 123010, ¶ 32. "Prejudice" is shown by demonstrating that the claim not raised during the initial proceeding so infected the trial that the resulting conviction or sentence violated due process. 725 ILCS 5/122-1(f) (West 2018); *Dorsey*, 2021 IL 123010, ¶ 32.

¶ 34     A trial court should deny leave to file a successive postconviction petition when it is clear from a review of the successive petition and supporting documents that the claims raised fail as a matter of law or are insufficient to justify further proceedings. *Dorsey*, 2021 IL 123010, ¶ 33. In other words, the court must determine whether the defendant has made a *prima facie* showing of cause and prejudice. *People v. Bailey*, 2017 IL 121450, ¶ 24. We review *de novo* the denial of a motion for leave to file a successive petition under the Act. *LaPointe*, 2018 IL App (2d) 160903, ¶ 33.

¶ 35     We first address the "cause" prong. Defendant argues that he established cause for not raising his claim earlier because the legal basis upon which his claim is based stems from a line of cases that did not exist when his initial postconviction petition was filed in March 2008. Defendant cites: *Miller*, 567 U.S. 460; *People v. Reyes*, 2016 IL 119271; *House*, 2015 IL App (1st) 110580 (*House I); People v. House*, 2019 IL App (1st) 110580-B (*House II*), *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020); and *Harris II*, 2018 IL 121932. According to defendant, each of these cases

constitutes "a stepping stone in the evolution of how Illinois courts view juvenile punishment, expanding the reach of *Miller* to juveniles such as [himself], who were 21 at the time of the offense and were given lengthy term-of-years sentences."

¶ 36   In *Miller*, the Supreme Court held that a mandatory life sentence without the possibility of parole imposed on a defendant under the age of 18 at the time of his or her offense violates the eighth amendment's prohibition against cruel and unusual punishment (U.S. Const., amend. VIII). *Miller*, 567 U.S. at 465, 479. Under *Miller*, a juvenile defendant may be sentenced to life imprisonment if the trial court finds that the defendant's conduct showed "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46. Before imposing that penalty, the trial court must consider the defendant's youth and its attendant characteristics. *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78). Our supreme court has held that *Miller* applies retroactively to cases on collateral review (*People v. Davis*, 2014 IL 115595, ¶¶ 39, 42) and that it governs both mandatory and discretionary life sentences, whether natural or *de facto* (*i.e.*, over 40 years) (*Buffer*, 2019 IL 122327, ¶¶ 27, 41).

¶ 37   Defendant acknowledges that, because he was 21 years old when he committed the offense and was given a 47-year sentence, his case does not fall within the "literal parameters" of *Miller*, which dealt only with a mandatory life sentence imposed on a juvenile. Nevertheless, defendant contends that "*Miller* and its progeny have prompted a re-evaluation of the constitutional limitations of young-adult sentences under the Illinois proportionate penalties clause, and provide support for his constitutional claim that was not previously available."

¶ 38   The State points out, and defendant concedes, that this court found that the defendants in *LaPointe*, 2018 IL App (2d) 160903, and *Hoover*, 2019 IL App (2d) 170070, failed, in similar

circumstances, to establish cause to justify the filing of their successive postconviction petitions. We agree with the State that those decisions control here.

¶ 39     In *LaPointe*, the defendant, who had turned 18 years old just before the offense, was convicted of first-degree murder and sentenced to life imprisonment without parole based on a finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 10-11. In August 2016, after unsuccessfully seeking collateral relief in 2002 and 2011, the defendant sought leave to file a successive petition under the Act. His proposed petition claimed that his sentence was unlawful under both the eighth amendment as construed in *Miller* and the proportionate-penalties clause. *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 19, 25. The defendant claimed that, because *Miller* was not decided until 2012, he had cause for not including his claim in his initial postconviction petition filed in 2002. *LaPointe*, 2018 IL App (2d) 160903, ¶ 19. As to prejudice, the defendant contended that his sentence was unlawful because the trial court failed to consider several of the mitigating factors required under *Miller*, including his youth, family situation, home environment, emotional- and mental-health histories, and potential for rehabilitation. *LaPointe*, 2018 IL App (2d) 160903, ¶ 20. The proposed petition set forth with specificity how the trial court purportedly failed to consider the *Miller* factors. *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 24-25. The trial court denied the defendant leave to file the proposed petition. *LaPointe*, 2018 IL App (2d) 160903, ¶ 29.

¶ 40     On appeal, after finding that the defendant's eighth amendment claim under *Miller* failed because he was not a juvenile at the time of the offense (*LaPointe*, 2018 IL App (2d) 160903, ¶¶ 34-47), we addressed his proportionate-penalties claim. Regarding cause, we held that the claim could have been raised in the defendant's initial postconviction petition, given that the proportionate-penalties clause "was very much in existence then, and the historical fact on which

[the defendant's] claim rests—his youth at the time of the offense—was known to all concerned." *LaPointe*, 2018 IL App (2d) 160903, ¶ 55. We further noted that the underlying proposition that a defendant's youth is highly relevant in setting the penalty for his crime was not novel and that the defendant had cited a 19th-century decision holding that " '[t]he habits and characters' " of minors " 'are, presumably, to a large extent as yet unformed and unsettled.' " *LaPointe*, 2018 IL App (2d) 160903, ¶ 55 (quoting *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894)). We concluded that "the materials that [the] defendant needed to assemble an argument that his sentence was unconstitutionally severe in light of his youth were already available when he filed his first postconviction petition." *LaPointe*, 2018 IL App (2d) 160903, ¶ 55. The proof was in the nature of the defendant's arguments in the underlying proceedings. He argued at sentencing that life imprisonment would be improper given his youth, particularly his emotional immaturity, and he argued on direct appeal that his sentence was an abuse of discretion in light of the goal of rehabilitation that the proportionate-penalties clause commands courts to consider. *LaPointe*, 2018 IL App (2d) 160903, ¶ 55.

¶ 41    We further explained as follows:

"*Miller*'s nonexistence did not prevent [the] defendant from contending that the trial court's alleged failure to consider his youth as a factor in mitigation violated the proportionate-penalties clause. *Miller*'s nonexistence as of 2002 merely deprived defendant of some helpful support for that claim. Surely, [the] defendant's contention that this created 'cause' proves too much. If the acquisition of new scientific knowledge to support an already viable claim were all that a defendant needed to show in order to raise the claim years late [*sic*], then the 'cause' requirement of section 122-1(f) would be a weak threshold indeed. It is one thing to hold, as the [Supreme] Court did [in *Montgomery v.*

*Louisiana*, 577 U.S. 190, 212 (2016)] that a substantive rule of law applies retroactively to a case that has completed the direct-appeal process. [Citation.] It is quite another to hold that everything written in support of that new rule also applies retroactively and thus requires reopening a judgment that did not even implicate the new rule." *LaPointe*, 2018 IL App (2d) 160903, ¶ 59.

¶ 42　We also concluded that the failure to raise the claim earlier did not prejudice the defendant because the claim lacked merit. *LaPointe*, 2018 IL App (2d) 160903, ¶ 60. We initially questioned whether the defendant's claim was a constitutional one at all. *LaPointe*, 2018 IL App (2d) 160903, ¶ 61. We noted that relief under the Act is limited to constitutional claims (725 IL CS 5/122-1(a)(1) (West 2018)) but defendant's claim amounted to nothing more than a contention that the trial court had "ignored the factors of youth and rehabilitative potential that the clause required it to consider." *LaPointe*, 2018 IL App (2d) 160903, ¶ 61. We further noted that the substance of the defendant's claim had been rejected on direct appeal. *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 62-63. We explained that the defendant's claim was "no more than a sentencing-discretion or improper-factor argument that was resolved, however much to [the] defendant's dissatisfaction, long ago." *LaPointe*, 2018 IL App (2d) 160903, ¶ 63.

¶ 43　In *Hoover*, 2019 IL App (2d) 170070, ¶¶ 37-43, we straightforwardly applied *LaPointe* to the case of a 22-year-old defendant who claimed that his discretionary life sentence for murder violated the proportionate-penalties clause. We affirmed the trial court's denial of leave to file a successive postconviction petition. We determined that the defendant's claim failed the cause prong of section 122-1(f) of the Act because the proportionate-penalties claim could have been raised earlier. *Hoover*, 2019 IL App (2d) 170070, ¶ 37. We further determined that the defendant

was not prejudiced since his claim, like LaPointe's, merely amounted to a contention that the trial court abused its discretion in sentencing. *Hoover*, 2019 IL App (2d) 170070, ¶¶ 38-43.

¶ 44    Here, as in *LaPointe* and *Hoover*, defendant has failed to establish cause as required by section 122-1(f) of the Act. Defendant could have raised his proportionate-penalties claim in his initial petition under the Act, which he filed in 2008. At that time, not only did the proportionate-penalties clause exist, but the principle that a defendant's youth and intelligence are relevant to sentencing was well-established. See *LaPointe*, 2018 IL App (2d) 160903, ¶ 55; *Hoover*, 2019 IL App (2d) 170070, ¶ 37.

¶ 45    Defendant relies principally on *Harris II*, 2018 IL 121932, *House I*, 2015 IL App (1st) 110580, *House II*, 2019 IL App (1st) 110580-B, and *Reyes*, 2016 IL 119271, to establish cause, but to no avail here. *Reyes* held that pursuant to *Miller*, "sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment." *Reyes*, 2016 IL 119271,¶ 9. In *Reyes*, the 16-year-old defendant was convicted of murder and two counts of attempted murder. *People v. Reyes*, 2016 IL 119271, ¶ 1. The trial court sentenced the defendant to a legislatively-mandated term of 97 years' imprisonment. *Reyes*, 2016 IL 119271, ¶ 2. Further, because of the truth-in-sentencing statute (730 ILCS 5/3-6-3(b)(i)-(ii) (West 2008)), the defendant was required to serve a minimum of 89 years of the 97-year sentence imposed before he would be eligible for release. *Reyes*, 2016 IL 119271, ¶ 2. *Reyes* does not apply here for at least two reasons. First, defendant does not raise on appeal any claim that his sentence violates the eighth amendment. See *People v. Ross*, 2020 IL App (1st) 171202, ¶ 20 (pointing out that Illinois courts consider the sentencing claims of young-adult offenders under the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) rather than the eighth amendment of the United States

Constitution (U.S. Const., amend. VIII)); *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 34-47 (rejecting young-adult offender's claim that his sentence violated the eighth amendment of the U.S. Constitution). Second, defendant would not be entitled to relief under *Reyes* because he was not a juvenile at the time the offenses were committed. See *LaPointe*, 2018 IL App (2d) 160903, ¶ 44 (holding that in *Miller* and other cases the Supreme Court drew a bright line at age 18 separating juveniles from adults).

¶ 46    In *Harris II*, the defendant was 18 years old at the time of his offenses. *Harris II*, 2018 IL 121932, ¶ 1. He was convicted of first-degree murder, attempted first-degree murder, and aggravated battery with a firearm and was sentenced to a mandatory minimum aggregate term of 76 years in prison. *Harris II*, 2018 IL 121932, ¶ 1. The defendant argued on direct appeal that eighth-amendment *Miller* protections for juveniles should be extended to "all young adults under the age of 21." *Harris II*, 2018 IL 121932, ¶ 53. The court rejected this "facial challenge," declining to hold that *Miller* applies to all offenders between the ages of 18 and 21. *Harris II*, 2018 IL 121932, ¶¶ 54-61. The court reasoned that, while the Supreme Court has "unmistakably instructed that youth matters in sentencing," it nevertheless has not "extended its reasoning to young adults age 18 or over." (Internal quotation marks omitted.) *Harris II*, 2018 IL 121932, ¶ 56. The defendant also argued that the statutory sentencing scheme of mandatory minimums, as applied to him, violated the proportionate-penalties clause given the facts of his case, his youth, and the other mitigating circumstances. *Harris II*, 2018 IL 121932, ¶¶ 36-37. The defendant relied on *Miller* for this claim as well. *Harris II*, 2018 IL 121932, ¶ 37. The court declined to consider the claim, however, because it had not been factually developed in the trial court. *Harris II*, 2018 IL 121932, ¶¶ 39-41. There had been no evidentiary hearing on the claim or findings of fact on the defendant's specific circumstances. *Harris II*, 2018 IL 121932, ¶ 40. However, citing to *People v. Thompson*,

2015 IL 118151, the *Harris II* court noted that the "defendant was not necessarily foreclosed from raising his as-applied challenge in another proceeding," such as in a postconviction petition. *Harris II*, 2018 IL 121932, ¶ 48.

¶ 47    In *House I*, 2015 IL App (1st) 110580, the defendant was found guilty of two counts of first-degree murder based on an accountability theory (he had acted as a lookout during the murders), and two counts of aggravated kidnapping. *House I*, 2015 IL App (1st) 110580-B, ¶¶ 3, 82. The defendant, who was 19 years old at the time of the offenses, was sentenced to two consecutive mandatory life sentences for murder and two 30-year prison terms for kidnapping, to run consecutively to the life sentences. *House I*, 2015 IL App (1st) 110580, ¶¶ 3, 20. While his direct appeal was pending, the defendant filed a postconviction petition raising numerous claims, including a claim that the statute mandating life sentences was unconstitutional as applied to him. *House I*, 2015 IL App (1st) 110580, ¶¶ 31, 34. On appeal from the dismissal of the petition, the reviewing court agreed with the defendant and held that a mandatory life sentence for a 19-year-old defendant found guilty by accountability violated the proportionate-penalties clause. *House I*, 2015 IL App (1st) 110580, ¶ 101. The court noted that "[t]he lack of discretion afforded the trial court for the imposition of a mandatory life sentence is especially relevant when the defendant is a young adult, over 18, but still not considered a fully mature adult." *House I*, 2015 IL App (1st) 110580, ¶ 100. The court found that, "[g]iven [the] defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior violent convictions, *** [the] defendant's mandatory sentence of natural life shocks the moral sense of the community." *House I*, 2015 IL App (1st) 110580, ¶ 101.

¶ 48    The State and the defendant each petitioned for leave to appeal to the supreme court. The supreme court denied leave to appeal but issued a supervisory order directing the appellate court

to vacate its decision and reconsider it in light of *Harris II*. *People v. House*, No. 122134 (Ill. Nov. 28, 2018) (supervisory order). Following remand, the appellate court adhered to its holding that the statute mandating life sentences, as applied to the defendant, violated the proportionate-penalties clause. *Harris II*, 2019 IL App (1st) 110580-B, ¶ 65, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020). The court remanded for "a new sentencing hearing in which the trial court has the ability to consider the relevant mitigating factors prior to imposing a sentence of such magnitude." *House II*, 2019 IL App (1st) 110580-B, ¶ 65, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020).

¶ 49    Neither *Harris* nor *House* establishes cause for defendant's failure to include his proportionate-penalties claim in his initial petition. Neither case put forward a new substantive rule of law. The absence of these cases did not prevent defendant from alleging in his initial petition that the trial court failed to consider his youth, intelligence, and related circumstances as factors in mitigation and therefore violated the proportionate-penalties clause. Certainly, *Harris* and *House* supplied additional support by presenting particular factual scenarios to which the courts in those cases applied established constitutional principles. However, as we stressed in *LaPointe*, the absence of additional support for a claim does not constitute cause for failing to bring the claim earlier. See *LaPointe*, 2018 IL App (2d) 160903, ¶ 59.

¶ 50    Defendant argues that *LaPointe* and *Hoover* were wrongly decided. He points to cases from other appellate districts holding that "as-applied *Miller* claims by defendants 18 years or older merited leave to file in successive post-conviction proceedings." However, none of the cases cited address our rationale in *LaPointe* and *Hoover* or explain why it is wrong. Defendant also argues that "the Illinois Supreme Court has historically refused to provide a static definition of what kind of punishment is so disproportionate as to shock the moral sense of the community." Defendant notes the supreme court's remark that, "as our society evolves, so too do our concepts of elemental

decency and fairness which shape the 'moral sense' of the community." *People v. Miller*, 202 Ill. 2d 328, 339 (2002). However, this merely provides additional support for defendant's argument that his sentence violates the proportionate-penalties clause. That claim required only the existence of the clause itself and the underlying facts of the case. See *Hoover*, 2019 IL App (2d) 170070, ¶ 37; *LaPointe*, 2018 IL App (2d) 160903, ¶ 55. As we explained in *LaPointe*, if the acquisition of new support for an already viable claim were all a defendant needed to show cause for failing to raise the claim earlier, then the cause requirement "would be a weak threshold indeed." *LaPointe*, 2018 IL App (2d) 160903, ¶ 59.

¶ 51    Based on the foregoing, we find that defendant has not established cause for failing to raise his proportionate-penalties claim in his initial postconviction proceeding. Because defendant failed to demonstrate cause, we need not consider whether he has demonstrated prejudice. See *People v. Brown*, 225 Ill. 2d 188, 207 (2007) (noting that if a defendant fails to meet one prong of the cause-and-prejudice test, the court need not determine if the other prong was satisfied). We hold that the trial court properly denied defendant's motion for leave to file a successive postconviction petition under the Act.

¶ 52                                    III. CONCLUSION

¶ 53    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 54    Affirmed.